755 A.2d 1147

EMIL D. DEVITO, PLAINTIFF–APPELLANT AND CROSS–RE-
SPONDENT, v. JAMES J. SHEERAN, DEFENDANT–RESPON-
DENT, AND LENA CHANG AND PROPAC–MASS, INC., DE-
FENDANTS–RESPONDENTS AND CROSS–APPELLANTS, AND
MASSACHUSETTS EMPLOYERS INSURANCE EXCHANGE,
DEFENDANT.

Argued March 27, 2000—Decided July 31, 2000.

168

*William J. Brennan, III,* argued the cause for appellant and cross-respondent (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *Mr. Brennan* and *William E. McGrath, Jr.,* of counsel and on the briefs).

*R. Scott Thompson,* argued the cause for respondent (*Lowenstein Sandler,* attorneys; *Matthew P. Boylan* and *Robert L. Lombardi,* on the brief).

*Theodore W. Geiser,* argued the cause for respondents and cross-appellants.

The opinion of the Court was delivered by

LAVECCHIA, J.

Following a six-week trial, a jury found that a contract implied-in-fact existed as among plaintiff Emil DeVito, defendants James J. Sheeran and Lena Chang, and non-parties Arthur H. Aaronson and Richard McDonough. The jury concluded that Chang had breached that contractual agreement and awarded DeVito $1,825,000 in damages. On appeal, the Appellate Division, in an unpublished opinion, reversed the jury's verdict, holding that the agreement reached by the parties was unenforceable because it failed to satisfy the writing requirements for the sale of securities under the statute of frauds, *N.J.S.A.* 12A:8–319.

Plaintiff filed a petition for certification, challenging the reversal of the jury verdict under the statute of frauds. Defendants Chang, and PROPAC–Mass cross-petitioned for certification, challenging an evidentiary ruling involving *N.J.R.E.* 804(b)(6) that was affirmed by the Appellate Division. We granted both parties' petitions, 162 *N.J.* 487, 744 *A.*2d 1210 (1999), and now reverse on the question of the statute of frauds and affirm on the evidentiary ruling.

## I.

In 1986, McDonough and Sheeran, two former Commissioners of Insurance for the State of New Jersey, incorporated an insurance management company named Professional Property and Casualty Underwriters, Inc. The corporation elected subchapter

S tax status under the Internal Revenue Code.[1]  Although its name was changed to PROPAC Underwriters, Inc. (PROPAC), its objective remained the same.  PROPAC's purpose was to seek out opportunities to form insurance reciprocals [2] under the PROPAC name for individuals or entities experiencing difficulty in obtaining or affording insurance coverage in the standard market.  PRO-PAC would act as the attorney-in-fact for the reciprocals, providing management services for those entities formed under the PROPAC name.

In 1987, PROPAC formed the Licensed Beverage Insurance Exchange (LBIE), the first of several reciprocals that it would manage as attorney-in-fact.  Immediately after LBIE was approved by the New Jersey Department of Insurance in February 1987, PROPAC began working on the formation of another reciprocal, Fidelity Environmental Insurance Company (FEIC), a stock insurance company designed to service the growing need for asbestos abatement liability insurance coverage.  FEIC was approved by New Jersey regulators in September 1987.  As with LBIE, PROPAC entered into a management contract with FEIC to serve as its attorney-in-fact.

Initially, ownership in PROPAC was held by two individuals, Sheeran and McDonough, and an investment banking company, the Sword Group.  The Board of Directors included Sheeran, McDonough, William Sword and William Sword, Jr. McDonough

---

[1] A subchapter S corporation is a closely-held corporation that, for tax purposes, is treated like a partnership.  26 *U.S.C.A.* § 1361(a).

[2] The Appellate Division defined the term "reciprocal," or "reciprocal insurance," as

> that system of insurance whereby several individuals, partnerships, or corporations underwrite each other's risks against loss ... through an attorney in fact, common to all, under an agreement that each underwriter acts separately and severally and not jointly with each other.  18 Appleman, *Insurance Law and Practice* § 10121 at 224 (1945) (footnote omitted).

The authority to enter into reciprocal insurance contracts is set forth at *N.J.S.A.* 17:50–1 to –19.

served as president and chief executive officer. Sheeran served as vice-president and general counsel.

About the time FEIC was formed, DeVito and Aaronson also joined PROPAC as shareholders and members of its Board. The PROPAC shareholders operated under the principle that, as other entities in the venture were created, the PROPAC shareholders would all share in their ownership. In furtherance of PROPAC's purpose of forming insurance reciprocals, each of PROPAC's owners contributed to the formation of new entities in his own way. DeVito and Aaronson contributed their financial and accounting expertise; Sheeran and McDonough contributed their expertise in the insurance field.

When DeVito joined PROPAC in September 1987, he was the only member of PROPAC with hands-on executive experience in operating an insurance company. He was named PROPAC's chief financial officer and became a member of PROPAC's board of directors. He also became president of FEIC. DeVito received ten percent of PROPAC's outstanding stock, diminishing Sheeran's and McDonough's stock ownership of the company.

During that same time frame in 1987, Sheeran became involved with Chang professionally and socially.[3] Chang was a consultant to the insurance industry in Massachusetts. One of her clients was the Associated Industries of Massachusetts (AIM), which represented approximately 2700 businesses. Through her affiliation with AIM, Chang became aware that AIM's members were having difficulty obtaining insurance coverage for environmental accidents.

In the summer and fall of 1987, at Chang's suggestion, PROPAC began discussions with AIM to explore the formation of an environmental insurance reciprocal in Massachusetts. At the October 29, 1987, meeting of PROPAC's board of directors, Sheeran reported about the "Massachusetts project." By the January

---

[3] The personal relationship between Sheeran and Chang led to their marriage in June 1988.

1988 meeting of the board, it was clear that Chang was to be involved with PROPAC in planning, forming and implementing the proposed Massachusetts entity. As Sheeran reported at that meeting:

> PROPAC is seeking to form a reciprocal through Associated Industries of Massachusetts (AIM).... [AIM] has basically reported to [Chang] that she will be the attorney-in-fact for the reciprocal and current plans are for it to be a joint venture between Chang & Co. and PROPAC.

Later during the discussion, Sheeran proffered that he believed PROPAC would get the contract from AIM because PROPAC was the only company in discussion with AIM about that matter.

The formation of a workers' compensation reciprocal in Massachusetts also was discussed at the January 29th meeting. Sheeran reported that

> there is a second opportunity. Massachusetts is involved in a fight over workers' compensation rates.... AIM had its own workers' compensation program but there may be a great opportunity to get a reciprocal formed to write workers' compensation insurance. The matter will be pursued further.

The Massachusetts "opportunity" was discussed with regularity by the PROPAC board members. The "Massachusetts Pollution Reciprocal" was listed as an issue for discussion on the February 26, 1988, agenda. Those minutes reflect that Sheeran and Chang were in Massachusetts making a presentation to AIM. By memorandum dated April 6, 1988, Sheeran informed DeVito and McDonough of the promising developments in Massachusetts, again mentioning the workers' compensation concept. At the April 27th board meeting, Sheeran reported

> that the Massachusetts Pollution Reciprocal is moving along very quickly. PROPAC intends to enter into a joint venture with Chang & Co. The structure of the joint venture has been proposed by Dr. Chang and will be discussed at [a future meeting of the board]. The new company will soon be filing for preliminary authority.

At a special board meeting held on May 9, 1988, the allocation of shares in the Massachusetts entity known as PROPAC–Mass was addressed. Chang proposed that ownership in PROPAC–Mass should be divided so that she would receive sixty percent of its shares, and the PROPAC shareholders, as a whole, would receive a forty-percent interest in PROPAC–Mass.

The possibility of Chang also receiving PROPAC shares was raised at the same meeting. The board discussed another proposal prepared by Chang, dated April 21, 1988, in which she proposed to be permitted to buy into PROPAC upon the operation of the first New England management agreement with any insurance mechanism. She also capped the amount she would like to purchase at ten percent as indicated by the following statements from that memorandum:

> [U]pon operation of the first New England management agreement with any insurance mechanism, [Chang] would like 5%, and upon operation of the second New England management agreement with any insurance mechanism, another 5%. If three or more such agreements are established, her interest would not increase.

At the regular board meeting on May 23, 1988, the members indicated that an agreement with Chang regarding the allocation of PROPAC–Mass shares would need to be finalized, and that DeVito would need to determine a "trigger" mechanism for when PROPAC shares could be made available to Chang.

On June 17, 1988, the board continued its discussion concerning the allocation of shares in PROPAC–Mass. The board indicated that it would be willing to give Chang five percent of the PROPAC stock upon the operation of the proposed workers' compensation reciprocal, as well as an additional five percent when the proposed pollution reciprocal reached $200,000 in subchapter S profits. Later, Chang forwarded a memorandum to the PROPAC Board, in which she continued to advance a proposal to acquire PROPAC stock, but at "a nominal cost of $1.00 per share." In all other respects, Chang's proposal was consistent with the discussion of the PROPAC board members at the June 1988 board meeting. No further discussion on those subjects occurred at PROPAC board meetings until March 1989.

Thus, through June 1988, Sheeran was working on PROPAC's behalf with Chang, to form one or more insurance reciprocals in Massachusetts. With the consent of PROPAC, PROPAC–Mass was incorporated in August 1988 using the PROPAC name.

Sheeran was named chief executive officer, president and a member of its board. Chang was the primary shareholder.[4]

The record indicates that both before and after the incorporation of PROPAC–Mass, PROPAC's resources and personnel were used to develop and operate the Massachusetts entity. Sheeran spent a substantial amount of time getting PROPAC–Mass up and running. During the early part of 1988, Sheeran spent one or two days a week, or every other week, in Massachusetts, working on matters for PROPAC–Mass. According to DeVito, even while Sheeran was in New Jersey, he focused his time on the Massachusetts project.

DeVito also devoted substantial effort to the development of PROPAC–Mass, efforts for which he did not receive remuneration. Indeed, we note that none of the PROPAC shareholders, other than Sheeran, received any remuneration for the individual effort that they expended in implementing PROPAC–Mass, nor did they receive any compensation for allowing the Massachusetts reciprocal to go forward using the PROPAC name. All appeared to be doing their part in a joint venture consistent with PROPAC's primary objective: to identify the need for and then create insurance reciprocals. With regard to plaintiff we note that, when meeting with the Insurance Commissioner of Massachusetts to solicit regulatory approval for PROPAC–Mass, Sheeran introduced DeVito to the Massachusetts commissioner as the vice president of finance and chief financial officer of PROPAC–Mass, although the record discloses that DeVito had not been appointed to those positions within PROPAC–Mass. Sheeran elaborated further to the Massachusetts commissioner, indicating that DeVito was assigned those positions because he knew more about accounting for reciprocals than anyone else in the country.

---

[4] Chang later gave Sheeran a substantial interest in PROPAC–Mass. As of October 19, 1994, Sheeran owned fifty percent of the stock in PROPAC–Mass. He was the only PROPAC owner to receive shares of PROPAC–Mass.

During the application process for PROPAC–Mass' regulatory approval, it was DeVito who prepared the "projection analysis" and "sensitivity analysis" filings for the company. He also established PROPAC–Mass' financial foundation, setting up its books and general ledgers, and establishing its banking relationships. DeVito and Aaronson worked on PROPAC–Mass' financial statements for the years 1988 and 1989. DeVito also assisted in obtaining re-insurance for the reciprocal.

Coincidentally, during the early phase of planning and implementing PROPAC's expansion into the Massachusetts market, PROPAC's relationship with the Sword Group started to unravel, apparently due to differences the Sword Group developed with Sheeran and Chang. Because the Sword Group was withdrawing from PROPAC, the parties to this lawsuit agreed that Chang initially would be the sole shareholder of PROPAC–Mass and the precise ownership percentages in PROPAC–Mass would be sorted out among the shareholders of PROPAC after the Sword Group was bought out. By the Spring of 1989, Sheeran and McDonough reached an agreement concerning purchase of the Sword Group's PROPAC shares, which would take effect at the conclusion of PROPAC's fiscal year in September 1989. As part of the buy-out, PROPAC terminated its management contract with FEIC.

Upon the conclusion of the Sword Group negotiation, discussions between McDonough and Chang commenced regarding the distribution of ownership interests in PROPAC and PROPAC–Mass. McDonough had been designated spokesperson for all PROPAC owners. The following summarizes the course of conduct of the parties from August 1988 through July 1990 concerning the allocation and exchange of ownership interests in PROPAC, PROPAC–Mass and related insurance entities, which came into being during that period of time.

1. *August 1988:* PROPAC–Mass is formed. According to McDonough, the PROPAC shareholders agree to allow use of the PROPAC name for the Massachusetts company because it was the understanding of all parties concerned, including Chang, that the shareholders in PROPAC would be owners of PROPAC–Mass. McDonough certified that from the time PROPAC–Mass was created, he and

Chang frequently discussed how much ownership Chang would retain in PROPAC–Mass and how much interest she would be permitted to acquire in PROPAC. As noted, negotiations were disrupted due to a dispute between the Sword Group and certain PROPAC owners regarding Sheeran's billings for legal fees.

2. *January 1989:* Chang expresses an interest in exchanging twenty percent of her shares in PROPAC–Mass for five percent of shares in PROPAC, or in the alternative, she would exchange thirty-five percent of her shares in PROPAC–Mass for a fifteen-percent interest in PROPAC. McDonough responds by again requiring a "trigger" condition before Chang could acquire any PROPAC stock because of the start-up status of PROPAC–Mass. McDonough suggests that stock should be exchanged when the additional newly formed Massachusetts Employers Insurance Exchange (MEIE) acquires its final permanent certification of authority. Chang found this "trigger" condition unacceptable. The matter then remained stalled until late September 1989 while the Sword Group negotiated for and executed its withdrawal from PROPAC. During the interim, Chang began attending meetings of the PROPAC board starting in June 1989.

3. *July 1989:* An agreement is reached to buy out the Sword Group's interest in PROPAC, effective September 1989. To finance this buy-out, PROPAC sold its contract to manage FEIC. The Swords' shares in PROPAC became treasury stock with Sheeran, McDonough, DeVito and Aaronson owning 100% of PROPAC's stock in the same proportion that they had owned prior to the buy-out.

4. *September 1989:* McDonough resumes discussions with Chang, offering her fifteen percent of PROPAC shares in return for thirty-two-and-a-half percent (32.5%) of PROPAC–Mass stock.

5. *October 11 and 12, 1989 Memoranda:* McDonough sends two memoranda to Chang and the PROPAC shareholders outlining a stock transfer proposal that discusses an apparent agreement reached earlier in September 1989. Critical to this agreement was that, in the end, all parties would have similar interests in PROPAC, PROPAC–Mass and two other related entities about to be formed, Reciprocal Management Corporation (RMC) and Consumer Health Network (CHN). Under the proposal, Chang would first transfer thirty-two-and-a-half percent (32.5%) of PROPAC–Mass stock to the PROPAC shareholders, in exchange for a fifteen percent interest in PROPAC. Then, Chang would transfer approximately twenty-two-and-a-quarter percent (22.24%) of PROPAC–Mass shares to the PROPAC shareholders, in exchange for approximately ten-and-a-quarter percent (10.26%) of PROPAC stock. Finally, Chang would give McDonough and Sheeran each ten percent of her stock in PROPAC–Mass.

6. *November 1, 1989 Memorandum:* Plaintiff sends a memorandum to Chang and the PROPAC shareholders memorializing his response to the calculations in the October 11 and 12, 1989, memoranda. Plaintiff suggests a 50/15 (PROPAC–Mass/PROPAC) exchange with Chang.

7. *Mid–November 1989 Comment by McDonough:* According to plaintiff, McDonough informs him that he had reached a "final deal" with Chang regarding percentages that would be memorialized in a memorandum. In his deposition, McDonough did not remember saying that to plaintiff, but did claim that an agreement had been reached by this date.

8. *November 17, 1989 Memorandum:* In a memorandum to Sheeran, plaintiff, Chang and Aaronson dated November 17, 1988, McDonough sets forth the "final deal." The subject line states: "Stock Distribution of PROPAC, PROPAC Agency, CHN, RMC and PROPAC–MASS." The memorandum states that "[o]n and after October 1, 1989, (the beginning of the new fiscal year) the following will be the respective stock interest" in all five corporations: Sheeran thirty percent (30%), McDonough thirty-percent (30%), Chang twenty-two-and-a-half percent (22.5%), DeVito fourteen percent (14%) and Aaronson three-and-a-half percent (3.5%). This is the document plaintiff claims "memorialized and confirmed" the oral agreement reached by the parties following several months of discussions between Chang and McDonough.

Plaintiff testified that after receiving this memorandum, he spoke to Sheeran and Chang, and all three expressed relief that the matter was resolved. Chang testified differently, stating that she was "shocked" by the memorandum because it did not resemble what the parties were discussing in October. She testified that in early December she told McDonough the percentages were unacceptable.

9. *Late November 1989:* RMC was formed to manage an automobile insurance reciprocal. The parties referred to in the November 17, 1989 memorandum contribute to RMC in a manner consistent with the November 17 memorandum. Also in late November 1989, CHN was formed. Again, the parties identified in the November 17, 1989 memorandum contribute to CHN in a manner consistent with the November 17 memorandum that outlines their respective ownership interests. Chang signs IRS forms in late November 1989, electing subchapter S status for RMC and CHN. An attorney at Sheeran's former law firm prepares two draft shareholders agreements in accordance with the "final deal." McDonough claimed that despite repeated attempts he could not get either Sheeran or Chang to sign the agreement.

10. *January 1990:* Chang sends a handwritten memorandum to McDonough objecting to the terms of the November 17th memorandum. She also suggests new percentages. Plaintiff claims that by early March McDonough told him that Chang was reneging on the deal.

11. *March 16, 1990:* McDonough and Chang meet and apparently agree to a new distribution formula whereby Chang would retain two-thirds ownership in PRO-PAC–Mass.

12. *March 20, 1990:* McDonough sends a handwritten memorandum to Chang that sets forth what was agreed to on March 16, 1990. Chang sends the March 20th memorandum back to McDonough with handwritten comments rejecting the agreement, and indicating that, although the percentages were correct, there were other elements unacceptable to Chang.

13. *March 29, 1990:* McDonough sends Chang and other PROPAC shareholders a handwritten memorandum restating the March 20 memorandum.

14. *April 5, 1990:* Chang sends McDonough a handwritten memorandum stating that she is terminating further discussions regarding the proposed exchange because they were never going to reach an agreement on the percentages.

15. *April 19, 1990:* Chang sends McDonough a letter inviting discussion on alternative means of providing services to one another. McDonough sends the

April 19 letter back to Chang with a notation that discussions would continue, as far as he was concerned, regarding a stock exchange.

16. *April 24, 1990:* Plaintiff writes a memorandum to the PROPAC shareholders that indicates an agreement had been reached with Chang and all that was needed was a shareholder's agreement.

17. *May 11, 1990:* McDonough sends a memorandum to Chang in response to Chang's April 5th memorandum, stating that negotiations should continue because "we agreed upon a deal in good faith at the very beginning of our involvement in Massachusetts, and you can't unilaterally withdraw it."

18. *June 1990:* Chang sends a memorandum to McDonough dated June 6th, denying that a deal had been reached and proposing an equitable exchange of stock (15% for 15%) based on an independent valuation of the stock of each company as of July 1, 1990. Plaintiff resigns from PROPAC in June 1990, but remains a shareholder. Plaintiff testified that the failure of Chang to "honor our agreement" was the main reason for his resignation. Plaintiff claims that he did not receive any compensation for the work he performed for PROPAC–Mass.

19. *July 1990:* McDonough, Sheeran and Aaronson send Chang a memorandum to accept the 15% for 15% proposal outlined in Chang's June 6th memorandum. However, the exchange never occurs. Chang claimed McDonough would stall whenever they discussed it. McDonough claimed Chang "reneged" on the agreement because PROPAC–Mass was becoming very profitable. At his deposition in March 1993, McDonough claimed that he continued to be in negotiation regarding the stock swap. We note that as of December 31, 1993, PROPAC–Mass's license was revoked by the Massachusetts Commissioner of Insurance on the basis that it breached its duty of good faith and fair dealing following the company's termination by AIM and others as their attorney-in-fact.

On June 17, 1992, plaintiff filed this suit against defendants Sheeran, Chang, PROPAC–Mass and MEIE [5] alleging that Chang and PROPAC–Mass breached an agreement that would have allowed DeVito to receive shares of PROPAC–Mass. Plaintiff claims that the parties agreed to a "joint venture" between PROPAC and Chang, and testified that Chang also, from the beginning, referred to the new company as "our joint venture" to be shared between Chang and the PROPAC shareholders. Defendants argue that because there was no agreement concerning percentages from the outset, there was no meeting of the minds concerning the alleged "joint venture." Instead, because negotiations continued regarding the precise percentages of shares, and because Chang was primarily responsible for the formation of

---

[5] For reasons not relevant to the appeal, MEIE was dismissed as a defendant.

PROPAC–Mass, defendants contend there was no legally enforceable agreement.

Defendants moved for summary judgment arguing, in part, that DeVito's contract claims were barred by the statute of frauds contained in *N.J.S.A.* 12A:8–319 (contracts for the sale of securities). Plaintiff also moved for leave of court to file an amended complaint adding McDonough as a plaintiff in the action against defendants.

The court granted defendants' motion in part, dismissing a number of plaintiff's claims. Plaintiff's remaining claims included breach of an oral or implied agreement, breach of an implied-in-fact contract, quantum meruit and estoppel. However, the court rejected defendant's affirmative defense under the statute of frauds, reasoning that the statute did not apply because the instant matter concerns "the reallocation of PROPAC-related shares, unlike the sale of securities to members of the public or to other people by specific contract."

Plaintiff's motion for leave to add McDonough as a plaintiff was denied. Because defense counsel had represented McDonough in an unrelated matter between 1993 and 1995, and because McDonough had met with the defense in preparing to defend the suit brought by DeVito, a non-waivable appearance of impropriety was deemed present if McDonough were to be permitted to join the suit as a plaintiff. McDonough ultimately filed a separate law suit against defendants in 1995 seeking similar relief to that sought by DeVito against defendants. That case is still pending.[6]

In August 1994, McDonough prepared a certification that was filed in opposition to defendants' motion for summary judgment. The certification originated in the form of McDonough's handwritten draft, subsequently typed by his administrative assistant, Andrea Penna. McDonough's certification, signed under oath,

---

[6] *Estate of McDonough v. James J. Sheeran, Lena Chang, PROPAC–Mass, Inc. and Emil D. Devito,* MER–L–1110–95, remains an active case in the Law Division of Mercer County.

conveyed his understanding that an agreement had been reached by the parties, and that that agreement was reflected in the November 17th memorandum. Not long after preparing that certification, McDonough unexpectedly passed away in September 1995. The trial court held an evidentiary hearing to determine whether to admit the certification pursuant to *N.J.R.E.* 804(b)(6). The certification was ruled admissible and later was read to the jury.

At the trial, defendants unsuccessfully raised the statute of frauds issue again during a pre-trial colloquy with the court. Defendants also moved for a directed verdict at the conclusion of plaintiff's case. The trial court rejected defendants' statute of frauds argument, and allowed the case to go to the jury.

Specifically, the court charged the jury to find whether

a Contract [was] reached between the shareholders of PROPAC Underwriters, a New Jersey Corporation (DeVito, Sheeran, McDonough, and Aaronson) and Dr. Lena Chang on or by the date of November 17, 1989[.]

By a unanimous verdict, the six-member jury found that a contract had been reached between the parties.

Then, the jury considered whether

Dr. Lena Chang breach[ed] that Contract which you have found was entered into between herself and James Sheeran, Emil DeVito, Richard McDonough, and Art Aronson[.]

The jury also unanimously concluded that a contract had been breached by Chang. The jury awarded DeVito $1,825,990 in damages. The court entered a judgment in that amount, and awarded plaintiff prejudgment interest in the amount of $204,456.

The Appellate Division rejected virtually all of defendants' contentions on appeal, except the issue regarding the statute of frauds. The panel concluded that the statute of frauds provision contained in *N.J.S.A.* 12A:8–319 applied and barred enforcement of the agreement reached by the parties.

Unlike the trial court, the Appellate Division concluded that the agreement reached by the parties constituted a sale of securities. The Appellate Division noted that the transaction involved securi-

ties, and that the proposed exchange of stock between PROPAC and PROPAC–Mass constituted a "sale," defined under New Jersey's Uniform Commercial Code, *N.J.S.A.* 12A:2–106(1) as the "passing of title from the seller to the buyer for a price." The court then focused its analysis on subsection (a) of *N.J.S.A.* 12A:8–319, concluding that because there was no writing signed by Chang indicating an agreement for the sale of PROPAC–Mass shares, the statute of frauds barred enforcement of any agreement reached by the parties. The court noted that the important elements required in the signed writing are the quantity of described securities and a definite or stated price. The court concluded that the small business tax forms for RMC and CHN, dated November 28, 1989, and bearing Chang's signature, did not contain any reference to PROPAC–Mass or to an exchange of shares. Therefore, there was no writing to satisfy the requirements of *N.J.S.A.* 12A:8–319(a).

Also, the Appellate Division rejected Plaintiff's argument that the statute of frauds was satisfied pursuant to subsection (c) of *N.J.S.A.* 12A:8–319 because the November 17th memorandum constituted a confirmation of the allocation of PROPAC and PROPAC–Mass stock interests and was not objected to by Chang within ten days of its receipt. The court observed that subsection (c) contemplates that a previous oral contract had been formed. Therefore, the court reasoned, if the November 17th memorandum was the agreement that should be enforced, then the memorandum cannot also constitute "confirmation of the sale or purchase." The court concluded that subsection (c) relates to "mercantile usage" that usually includes form letters of confirmation sent by brokers to their customers after stock has been sold over the telephone. The panel noted that that was not the situation presented here.

Concerning plaintiff's contention that the trial court erroneously admitted McDonough's August 16, 1994 certification, the panel affirmed the trial court's evidentiary ruling. As noted, we granted both parties' petitions, 162 *N.J.* 487, 744 *A.*2d 1210 (1999), and now

affirm in part and reverse in part the judgment of the Appellate Division.

## II.

### A.

■ This case presents the somewhat unusual circumstance of construing a statute that has since been repealed. The statute of frauds section of Article 8 of the Uniform Commercial Code, *N.J.S.A.* 12A:8–319, was repealed by *L.*1997, *c.* 252, effective September 12, 1997. The new statute of frauds provision of Article 8, embodied in *N.J.S.A.* 12A:8–113, does not require a writing to evidence an agreement for the "sale or purchase of a security." Defendants are permitted, however, to raise a statute of frauds defense under *N.J.S.A.* 12A:8–319 because the Legislature included a savings clause when repealing that section.

Plaintiff contends that an overall agreement had been reached between the parties to establish and promote PROPAC–Mass, and to negotiate later in good faith for an apportionment of PROPAC–Mass stock, as well as PROPAC stock, as between the PROPAC shareholders and Chang after the Sword Group shareholders were no longer part of the ongoing endeavor. The November 17th memorandum was intended to memorialize the refined allocation of interests. Despite a jury verdict to the contrary, defendants maintain that no agreement was reached between the parties regarding the exact exchange of shares. Instead, defendants contend that the negotiations that commenced in 1987 never culminated in a writing that would indicate the precise ownership interests to be allocated among the parties. Thus, defendants maintain that even if an agreement was reached, that agreement must be deemed unenforceable under the statute of frauds, *N.J.S.A.* 12A:8–319.

We begin with the jury verdict. The jury found that the parties reached an agreement to share ownership interests in PROPAC–Mass and PROPAC. The record supports that finding because

the parties involved in that transaction, including plaintiff, worked throughout the relevant time period to ensure that PROPAC's plan, to form and operate a successful insurance reciprocal in Massachusetts, as in other locations, would be realized. The issue presented by this appeal is whether that agreement is enforceable under the statute of frauds.

New Jersey's statute of frauds, as set forth in *N.J.S.A.* 12A:8–319, required a writing for a contract for a "sale of securities" to be enforceable. In pertinent part, the statute provided that:

> A contract for the sale of securities is not enforceable by way of action or defense unless
>
> (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
>
> ✳ ✳ ✳
>
> (c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt[.]
>
> [<em>N.J.S.A.</em> 12A:8–319(a) and (c).]

In addressing whether the exchange of PROPAC stock for PROPAC–Mass stock constitutes a "sale of securities," we note that the parties agree that the stock in question falls within the definition of "security," which is an instrument that "is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment." *N.J.S.A.* 12A:8–102(1)(a)(iii). That section has been amended by *L.*1997, *c.* 252 to include stock of a closely-held company as a "security" for purposes of Article 8. *N.J.S.A.* 12A:8–102(a)(15)(c); *see also N.J.S.A.* 12A:8–103(a) ("A share or similar equity interest issued by a corporation ... is a security."). The question is whether the exchange of PROPAC and PROPAC–Mass stock between the parties as agreed and set forth in the November 17, 1989, memorandum is a "sale" within the meaning of the statute.

Other jurisdictions have grappled with the question of whether a transfer or exchange of stock is a "sale" of securities. In *Worrell v. Multipress, Inc.*, 45 *Ohio St.*3d 241, 543 *N.E.*2d 1277, 1280 (1989), plaintiff obtained financing from defendant for the purchase of a business. Plaintiff claimed that in return for the loan the parties orally agreed that defendant would own eighty percent of the company, and plaintiff and another purchaser would each own ten percent. *Ibid.* Plaintiff sued defendant for, *inter alia*, breach of a contract for the transfer of stock. *Id.* at 1279. The jury awarded plaintiff $300,000. *Ibid.*

The Ohio Supreme Court held that an oral promise to convey stock without a price is not a "sale" of a security; the relationship between the parties was one of promoter-investor in which no price was agreed on for the stock. *Id.* at 1281. Therefore, the Court held that the agreement was not subject to the statute of frauds and was enforceable. The Court emphasized: "No price or fee was to be forthcoming, either immediately or at a future date, from either party in exchange for the ownership interest in the newly formed corporation." *Ibid.* The court noted, however, that had defendant's promise been for an option to purchase the stock in the future for a price, the agreement would have been subject to the statute of frauds. *Ibid.*

Similarly, in *Maurer v. E.A. Gralia Const. Co.*, 37 *Mass.App.Ct.* 403, 640 *N.E.*2d 484, 485, *rev. denied*, 419 *Mass.* 1102, 644 *N.E.*2d 225 (1994), plaintiff and defendant orally agreed to form a company in which plaintiff was to have a one-third interest. However, after the company was formed and became profitable, plaintiff neither received shares of stock nor money. *Ibid.* The court held the agreement was not for the sale of stock, but rather to award plaintiff "a one-third piece of the action." *Id.* at 487. The court noted that there were none of the hallmarks of a true "sale of securities": there was neither a named corporation, nor a "particular quantity of [its] securities." Therefore, the agreement did not fall under the statute of frauds and was enforceable. *Ibid.*; *see also Williams v. Gaines*, 943 *S.W.*2d 185, 190 (Tex.App.1997,

writ denied) (finding exchange of stock in prospective corporation for services and assets was not "sale of securities", noting that no stock had been issued because corporation not in existence at time parties entered into agreement).

In other settings where stock is transferred as consideration for services or for the use of assets, courts have varied in their conclusions concerning whether a sale of securities occurred and implicated the statute of frauds. *Compare Thompson v. Kohl,* 216 *Ga.App.* 148, 453 *S.E.*2d 485, 488 (1994) (concluding that employer's oral agreement to transfer stock to employee was not "sale" of securities for statute of frauds purposes because employee did not pay for stock in currency, but in services rendered), *cert. denied* (Ga.1995), *and Jones v. Cecil Sand and Gravel, Inc.,* 97 *Md.App.* 87, 627 *A.*2d 60, 64 (1993) (finding that writing requirement under statute of frauds for sale of securities contracts did not apply to oral employment contract agreeing to exchange of stock for services) *and Baldassarre v. Singer,* 444 *Pa.* 100, 282 *A.*2d 262, 264 (1971) (concluding that transfers of securities pursuant to employment contract are not "sales" of securities) *with Burns v. Gould,* 172 *Conn.* 210, 374 *A.*2d 193, 199–200 (1977) (finding contract concerning services in exchange for stock would be covered by statute of frauds providing for sale of securities) *and Hogan v. Long,* 922 *S.W.*2d 368, 369 (Ky.1995) (finding oral contract to transfer stock to employee in return for performance of services was evaluated under statute that provided writing was necessary for enforceable "sale" of securities) *and Gross v. Vogel,* 81 *A.D.*2d 576, 437 *N.Y.S.*2d 431, 432 (App.Div.1981) (concluding agreement, whereby employee's services were exchanged for stock ownership in closely-held corporation, was "sale of securities"); *Wakefield v. Crawley,* 6 *S.W.*3d 442, 450–51 (Tenn.1999) (finding oral agreement to pay investment banker with stock for providing consulting services to closely-held corporation was governed by statute of frauds pertaining to "sale" of securities, and lack of writing rendered agreement unenforceable).

In analyzing this case, the Appellate Division found persuasive two Texas cases that took a broad view of the concept of "price" when considering whether a stock sale had occurred. In *Gannon v. Baker*, 830 *S.W.*2d 706 (Tex.App.1992, writ denied), the defendant became a shareholder in a corporation that previously had been a partnership between the plaintiff and a third party. When initially incorporating that business entity, defendant received sixty percent of the corporation's ownership, and the plaintiff and his business partner each held twenty percent. *Id.* at 708. The plaintiff in *Gannon* alleged that when the parties agreed to this initial allocation of ownership, the parties also agreed, orally, that defendant eventually would transfer his interest back to plaintiff and his business partner upon the termination of a trust agreement. *Ibid.* The court found that because the plaintiff agreed to devote more "time, energy, and effort" upon receiving some of defendant's share in the corporation, additional consideration transformed the transaction into a "sale of securities" for purposes of Texas' statute of frauds provision. *Id.* at 710. Consequently, the court held that compliance with the statute of frauds was required. *Ibid.*

In another Texas case, the parties in *Barbouti v. Munden*, 866 *S.W.*2d 288, 291 (Tex.App.1993, writ denied), *overruled on other grounds, Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs and Contractors, Inc.*, 960 *S.W.*2d 41, 47 (Tex.1998), agreed to form two companies, one foreign and another domestic, for the purposes of financing plaintiff's business venture. The plaintiff alleged that defendant later breached his agreement to transfer his interest in the domestic company to plaintiff in exchange for plaintiff's interest in the foreign company. Here, too, the court held that the transfer, or "swap of 'stock for stock' " was a "sale of securities" because each party exchanged an interest in one company in return for another. *Id.* at 294.

In this matter, the allocation of interests in the variously created entities was but one part of an overall agreed upon insurance venture. In that context, the allocation of interests in

the component insurance entities was not a sale of securities, but rather was an incident to an overall insurance enterprise in which the individuals intended to work together in planning and forming PROPAC insurance reciprocals in the Massachusetts region and elsewhere. The planned inclusion of Chang in that venture, through her involvement in the creation of PROPAC–Mass and later her inclusion in the group of PROPAC owners, became a step in a previously formulated enterprise.

We note that in the earliest discussions between Chang and the PROPAC owners concerning the start-up of PROPAC–Mass, the parties merely discussed the percentage of PROPAC–Mass stock that Chang would retain after incorporation. No mention was made of allowing Chang into PROPAC's ownership initially. Events occurring in the ensuing months changed the PROPAC shareholders' outlook, first to consider whether Chang would be permitted to purchase shares of PROPAC, and later whether to allow a stock-for-stock exchange when admitting Chang into PRO-PAC's ownership. There does not appear to have been any debate about whether the PROPAC owners would receive PRO-PAC–Mass stock. The discussion always focused on how the respective interests would be allocated. Chang's later hesitancy in coming to "agreement" on this allocation of interests reflects the fact that the delay in that agreement was accompanied by an increase in the market value of PROPAC–Mass, giving Chang added leverage to increase her interest in PROPAC and in PROPAC–Mass.

Construed fairly, this transaction was not a sale or exchange of stock. It must be viewed in its larger context, that of a joint enterprise involving contributions of skill and experience by the common investors in this joint venture. We cannot ignore the significant consideration provided by the PROPAC owners in the joint effort to establish PROPAC–Mass. That consideration included use of the PROPAC name and the value of the professional services and time devoted by plaintiff and other PROPAC owners who "financed" or "promoted" the start-up of PROPAC–Mass.

It was always envisioned that the PROPAC owners and Chang jointly would own interests in PROPAC–Mass, in which all had a part in establishing. Chang essentially functioned as a nominee for the PROPAC owners. But well before PROPAC–Mass was incorporated, all agreed that all parties to the enterprise would have "a piece of the action" in PROPAC–Mass. *Maurer, supra*, 640 *N.E.*2d at 487. It was error to view the transaction as a "sale" of securities as if the PROPAC owners were "outsiders" being permitted to "buy in." They were in.

It distorts the larger context of this transaction to hone in exclusively on the physical exchange of stock contemplated by the allocation of ownership interests in PROPAC and PROPAC–Mass. The delay in agreeing on the respective percentages of ownership in PROPAC–Mass, initially due to the common decision to wait until the Sword Group had exited from PROPAC, may have resulted ultimately in increasing Chang's share in the various PROPAC related entities, but it did not alter the essence of this transaction. The formation of PROPAC–Mass was but one part of an ongoing joint venture advancing an insurance reciprocal enterprise. Accordingly, we hold that the transaction in issue does not constitute a sale of securities requiring compliance with the statute of frauds.

### B.

Even on the assumption, however, that the statute of frauds applied to the transaction in question, a collateral issue is whether a writing has been produced that constitutes a memorialization of the contract sufficient to satisfy the statute. *N.J.S.A.* 12A:8–319(a) provides that a contract for the sale of securities is not enforceable unless

> there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price[.]

Obviously, there is no writing signed by Chang that would fall precisely within the terms of subsection (a) of *N.J.S.A.* 12A:8–319.

The Appellate Division found the lack of a writing to be a basis for not enforcing the agreement between the parties. Plaintiff argues that because the November 17th writing refers to the allocation of ownership in a manner consistent with tax forms signed by Chang when incorporating two other PROPAC-related entities later that November, Chang should be bound by the terms outlined in the November 17th memorandum. Plaintiff relies on the reasoning that multiple writings may satisfy the statute of frauds if, taken together, the writings contain the necessary terms of the agreement and contain the signature of the party against whom enforcement is sought. *Sutton v. Lienau,* 225 *N.J.Super.* 293, 300, 542 *A.*2d 473 (App.Div.), *certif. denied,* 111 *N.J.* 650, 546 *A.*2d 559 (1988). The *Restatement (Second) of Contracts* § 132 (1981), addresses this point: "The memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction." We agree with the Appellate Division's conclusion that the writings proffered by plaintiff do not satisfy the requirements of subsection (a).

■ Plaintiff also contends that Chang's failure to object to the November 17th memorandum satisfies the conditions set forth in *N.J.S.A.* 12A:8–319(c), which provides that a contract for the sale of securities is not enforceable unless

within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt[.]

We note that Chang did not object within ten days, either orally or in writing, to the November 17th memorandum that precisely allocated the shares of PROPAC and PROPAC–Mass among the PROPAC shareholders and Chang. The Appellate Division, relying on the Fifth Circuit opinion in *Kroeze v. Chloride Group Ltd.,* 572 *F.*2d 1099, 1106 (5th Cir.1978), reasoned that subsection (c) was inapplicable because there was no previous oral contract formed between the parties. We disagree. The plain language of *N.J.S.A.* 12A:8–319(c) allows agreements similar to the one

reached between the PROPAC shareholders and Chang to be legally enforceable despite the fact that there is no writing signed by the party against whom enforcement is sought.

The parties initially agreed to work together in planning and establishing the PROPAC-related reciprocal, PROPAC–Mass, and PROPAC owners contributed their efforts, along with permission to use the PROPAC name, when they joined with Chang to effect the creation and promotion of PROPAC–Mass. From inception until November 17, 1989, and even for approximately five months thereafter, the parties openly discussed and did not disagree on the essential premise that the PROPAC shareholders would be owners in PROPAC–Mass. Chang first was suggesting that she buy into PROPAC and later sought an agreement to allow her entry into PROPAC through the exchange of part of her interest in PROPAC–Mass for an interest in PROPAC. The actual allocation of interests was the only issue to be determined.

By October 1989, McDonough and Chang had negotiated the rudimentary terms of the exchange. They met with other PRO-PAC shareholders in the beginning of November 1989 for further discussions and agreed on final refinements. The November 17, 1989, memorandum to Sheeran, DeVito, Chang and Aaronson, from McDonough, reflects that oral agreement reached in early November 1989. Thus, even under the reasoning of the Fifth Circuit in *Kroeze, supra,* subsection (c) is applicable because the parties had reached an agreement that the PROPAC shareholders, including DeVito, would receive a certain percentage interest in PROPAC–Mass, and Chang, in exchange, would also receive a certain percentage interest in PROPAC. All parties also would share in the same percentage interest in the new corporate endeavors, CHN and RMC. The November 17th memorandum is consistent with that oral agreement reached in November 1989. Chang did not object to that writing for two months.

The Appellate Division also viewed the terms of the November 17th document as not precise enough under subsection (a) to be enforceable under subsection (c). Again, we disagree. The

text of the November 17th memorandum specifically states the terms of the agreement, the quantity of the stock to be exchanged and the conditions that were to be effective as of October 1, 1989. There is sufficient documentation here to support the jury finding that the November 17th memorandum memorialized the agreement between the parties on the issue of allocation of shares. The parties never envisioned establishing a specific price, but instead always negotiated for a specific percentage of ownership. That is sufficiently precise to satisfy the statute's requirements.

Because Chang did not object until almost two months later, the terms of the November 17th memorandum would satisfy the requirements of the statute of frauds under *N.J.S.A.* 12A:8–319(c). The jury finding that there was a contract reached on or before November 17th implicitly recognizes a prior oral agreement memorialized in the writing dated November 17, 1989. It awarded damages consistent with that conclusion. We hold that the record supports the conclusion that subsection (c) of *N.J.S.A.* 12A:8–319 was satisfied, rendering the contract enforceable even if the statute of frauds were applicable.

### III.

Defendants maintain that the trial court committed error when it admitted McDonough's August 16, 1994, certification into evidence because there was no finding that the certification was made in good faith; the certification was not trustworthy; the certification was made in contemplation of litigation and was altered by McDonough's attorney; the certification was not based on McDonough's personal knowledge but instead contained impermissible statements of opinion; and finally, the certification was presented to the jury in an improper manner.

The Appellate Division held that the trial court did not abuse its discretion in admitting Defendant's certification pursuant to *N.J.R.E.* 804(b)(6). We agree with the Appellate Division's ruling.

In August 16, 1994, McDonough wrote a lengthy certification that was filed in opposition to defendants' motion for summary

judgment. That certification originated in the form of McDonough's handwritten draft, typed by his administrative assistant, Penna. The statements in the certification were certified as true, under penalty of perjury, by McDonough. In September 1995, McDonough died suddenly just before the trial commenced.

The trial court held an evidentiary hearing on whether to admit the certification at trial. Prior to the evidentiary hearing, plaintiff also filed a certification from Penna. Her certification stated that in April or May of 1994 a large envelope was sent to McDonough at PROPAC by plaintiff's attorney, William McGrath, Jr. It contained motion papers filed by Sheeran and Chang in DeVito's lawsuit. Penna's certification stated that in late June or early July of 1994, McDonough gave her a legal pad on which he had written pages of notes in paragraph form and asked her to type the document. The document went through several revisions by McDonough and in late July, at McDonough's request, Penna sent the document to McGrath. Penna certified that McGrath rearranged the order of the paragraphs, retyped the document on paper bearing the name of his law firm, and sent the document back to McDonough. McDonough signed it and it was filed.

At the evidentiary hearing, the trial court reviewed the alleged discrepancies between the statements McDonough made in his March 10, 1993, deposition and the statements he made in his certification. Ultimately, the trial court ruled that the certification was admissible, having made a specific finding that it was made in good faith. The court also found "that [the certification] is a trustworthy statement under the totality of the circumstances." The trial court added:

> Mr. McDonough evidently was trying to arrange his own conclusion on the PROPAC issue. He wanted to do so without litigation, without lawyers. It did not happen that way. He provided a certification. I find that his secretary provided facts that indicate its trustworthiness, expressed his opinion, and his personal knowledge as to issues of relevancy and/or issues of exceptions to some particular content of the certification.

*N.J.R.E.* 804(b)(6) is a hearsay exception that provides the means for the admission of statements made by a deceased

declarant. Such statements are admissible under *N.J.R.E.* 804(b)(6) "if the statement was made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." To admit evidence under *N.J.R.E.* 804(b)(6) four conditions must be satisfied: (1) the declarant must be dead; (2) the statement must have been made in good faith; (3) the statement must have been made upon the declarant's own personal knowledge; and (4) there must be a probability from the circumstances that the statement is trustworthy. *Ayala v. Lincoln,* 147 *N.J.Super.* 304, 307, 371 *A.*2d 302 (App.Div.1977). A trial court must make particularized findings of good faith, personal knowledge and trustworthiness prior to the admission of evidence of this nature under this hearsay exception. *Jeter v. Stevenson,* 284 *N.J.Super.* 229, 233, 664 *A.*2d 952 (App.Div.1995) (holding that failure of trial court to address either "good faith" or "trustworthiness" necessitated remand for preliminary hearing).

### a.   *Good Faith*

The Appellate Division held in *Ayala, supra,* 147 *N.J.Super.* at 307, 371 *A.*2d 302, that the mandate of a positive finding of good faith under *N.J.R.E.* 804(b)(6) "is not satisfied simply by a finding of the absence of bad faith." In *Ayala,* a negligence action, plaintiffs argued that the trial court erred when it admitted into evidence, over plaintiff's objection, the testimony of a "telephone representative" of defendant's insurer with respect to a telephone conversation with defendant, the insured, who had died before the trial. *Id.* at 306, 371 *A.*2d 302. In that conversation, initiated by the witness more than thirteen months after the accident, defendant was alleged to have described what had occurred on the date of the accident. *Ibid.* The trial court held that the statement was made in good faith, that the answers to the telephonic questions, although self-serving, appeared trustworthy and that the statement was admissible pursuant to *Evid.Rule* 63(32), the predecessor to *N.J.R.E.* 804(b)(6). *Ibid.*

The Appellate Division reversed, stating that it "perceive[d] no basis at all in the record for a finding of good faith." *Id.* at 307, 371 *A.*2d 302. The panel noted that the trial court ascribed its finding of good faith to the fact that the statement was "not given in bad faith, not given with intent to deceive." *Ibid.* The Appellate Division found this reasoning to be insufficient, noting, "[o]n the record before us, such a conclusion was wholly conjectural. Beyond this, the rule clearly requires a positive finding of good faith." *Ibid.*

In the instant case, as the Appellate Division noted, the trial court made a specific finding of good faith. Moreover, the trial court, in reading to counsel the proposed jury instruction on the matter, stated that she had previously ruled at the hearing that the certification was made in good faith. The trial court added:

Rule 804(b)(6) ... requires a positive finding of good faith, not merely an absence of bad faith.

I have compared both the statement and the deposition, I find that there is indicia of good faith, that the man was genuinely trying to work out his differences, certainly during the period of 1993 with Mr. Sheeran and Dr. Chang.

Defense counsel did not object to those observations. Contrary to defendants' argument, the trial court made a clear finding of good faith in this case.

### b. *Trustworthiness*

"[A]n absolute standard of trustworthiness is not essential before evidence is admissible under [804(b)(6) ]. The court need find only a probability that the statement is trustworthy from the flavor of the surrounding circumstances. The determination is a subjective one." *Beckwith v. Bethlehem Steel,* 185 *N.J.Super.* 50, 63, 447 *A.*2d 207 (Law Div.1982) (citation omitted).

Factors that are of assistance when considering the trustworthiness of a statement include: whether the statement was made under oath; the duration of time between the event and the statement; whether the declarant had firsthand knowledge; and

the credibility of the declarant. 2 *McCormick on Evidence* § 324 (5th ed.1999).

In *Jeter, supra,* 284 *N.J.Super.* at 231, 664 *A.*2d 952, a personal injury case, the court considered the issue of trustworthiness when the defendant sought to introduce a statement of a co-defendant (who died prior to trial) taken by an insurance company investigator two months after the accident. *Id.* at 231–32, 664 *A.*2d 952. The statement was not sworn to nor authenticated. *Id.* at 231, 664 *A.*2d 952. No other person corroborated the statements made in the document. *Id.* at 232, 664 *A.*2d 952. The document did not reflect the circumstances under which the statement was taken, the identity of the person taking it, whether it was dictated in full or in part, whether it was in the declarant's handwriting, and whether any other person was present. *Id.* at 231–32, 664 *A.*2d 952. The Appellate Division reasoned that the statement was not trustworthy. *Id.* at 234, 664 *A.*2d 952.

The Appellate Division discussed the issue of "time-lag" in *Ayala* when it held that testimony concerning a conversation that occurred between the deceased declarant and the witness more than a year after an accident occurred was not particularly trustworthy. *Ayala, supra,* 147 *N.J.Super.* at 307–08, 371 *A.*2d 302. In another matter, however, a statement made by a decedent to his brother twenty-two hours following an automobile accident was found to be trustworthy. *Jastremski v. General Motors Corp.,* 109 *N.J.Super.* 31, 36–38, 262 *A.*2d 218 (App.Div. 1970) (suggesting also that statement was trustworthy because declarant's statement was corroborated by his wife at trial).

Here, McDonough's certification was a sworn statement, authorized by a court rule. There was no time lag bearing on the trustworthiness of the statement. Moreover, McDonough, as an attorney, was aware that lying in a certification could result in perjury charges or disciplinary proceedings.

c. *In Anticipation of Litigation*

Defendant maintains McDonough made this statement purely for litigation purposes. But, as the Appellate Division noted:

McDonough's certification was not made for the purpose of perpetuating his testimony in anticipation of death. There is no dispute McDonough's death was sudden and unexpected. Nor was cross-examination a realistic possibility because Defendants had no warning McDonough was going to die. Rather, the fact the certification may have been made in contemplation of litigation is a matter which appears to go more to the weight to be given the evidence than to its admissibility.

The Appellate Division made a similar observation in *Beckwith, supra*, where the court recognized that the accusation that a witness falsely inculpated someone for self-serving reasons "relates to the weight the evidence is to be given to the jury, not to its admissibility." 185 *N.J.Super.* at 65, 447 *A.*2d 207. There the Appellate Division, pursuant to *Evid.Rules* 63(3) and 63(32), precursors to *N.J.R.E.* 804(b)(6), held admissible three unsigned depositions and one sworn statement of two unavailable witnesses given in other jurisdictions in connection with asbestos litigation pending in those jurisdictions. *Id.* at 54, 447 *A.*2d 207. The defendant argued that the statements were self-serving because one of the witnesses "may have inculpated Johns–Manville to help his friend." The court rejected this argument, noting:

Clearly, the guiding principle in such matters is to provide the jury with relevant evidence with a view to achieving substantial justice. The sworn statement is clearly admissible under the criteria of Evid.R. 63(32). Objections to relevancy and the like may be presented by defendant at trial.

[*Beckwith, supra*, 185 *N.J.Super.* at 65, 447 *A.*2d 207.]

Thus, whether the certification was prepared in contemplation of litigation or made for self-serving reasons is not dispositive of its admissibility, but rather goes to the weight to be given to the evidence. *See also Ross v. Lewin*, 83 *N.J.Super.* 420, 424, 200 *A.*2d 335 (App.Div.), *certif. denied*, 43 *N.J.* 258, 203 *A.*2d 713 (1964) (holding accusation that plaintiff's deposition was "self-serving" not a valid basis for denying admission under *Rule* 4.16; "[p]resumably, the testimony of every party is self-serving, whether it is given in open court or cast in the form of a deposition given in advance of trial.").

The Appellate Division found McDonough's certification was not made for the purpose of "perpetuating his testimony in anticipation of death" because his death was unexpected. Nor did Mc-

Donough prepare this statement for the purpose of avoiding cross-examination. McDonough was not yet a party to the litigation when he executed the certification, even though he was considering either joining in DeVito's suit or filing his own lawsuit against defendants. The fact that McDonough was contemplating litigation does not override the other indicators of trustworthiness or good faith. As the Appellate Division stated, the crux of the issue is how much weight should be afforded to the testimony, not whether it should be admitted into evidence. We agree with the determination that the statement was admissible. That was a discretionary determination for the trial court to make and, like the Appellate Division, we concur with the trial court's exercise of that discretion. *State v. Morton*, 155 *N.J.* 383, 453, 715 *A.*2d 228 (1998) (holding that traditional rules of appellate review require substantial deference to trial court's evidentiary rulings).

The Appellate Division also correctly disposed of the defendants' other arguments relating to the McDonough certification. First, defendants objected to McDonough's son reading his father's certification to the jury while showing the jury a picture of his father. The Appellate Division noted that defendants did not object to that procedure at trial and did not offer any proof of actual prejudice. Also, the Appellate Division noted that defense counsel read McDonough's deposition testimony to the jury.

Defendants also objected to the instructions given to the jury regarding the certification. The trial court stated to the jury that it determined McDonough's statement was "authentic." The Appellate Division, reviewing the instruction as a whole, noted that the common usage of the word "authentic" in the context in which it was used could mean either that the certification was actually made by McDonough or that it was an accurate statement of the facts presented therein. The court concluded that the trial court was referring to the former. We agree with the Appellate Division's analysis and find that the use of the word "authentic" in the trial court's instruction did not constitute plain error. The Appellate Division also found appropriate the trial court's use of

the word "final" when it advised the jury that McDonough's deposition was taken "about a year before the final deposition. The final certification. . . ." The panel held that use of the word "final" was an inadvertent reference and did not constitute plain error. The Appellate Division appropriately disposed of that issue.

## IV.

Defendants raised three additional arguments not addressed by the Appellate Division because of that court's ruling on the statute of frauds. Those issues are that

the trial judge erred in not dismissing plaintiff's case because he failed to present a prima facie case of breach of contract inasmuch as he failed to demonstrate that PROPAC was ready to exchange the shares of stock; erred in awarding prejudgment interest; and erred in imposing a constructive trust upon Sheeran.

[Slip op. at 55.]

In view of our ruling that the statute of frauds does not render the agreement among the parties unenforceable, the arguments by defendants now must be addressed. They are best resolved in the first instance by the Appellate Division.

## V.

In our view, the transaction at issue did not involve a sale of securities. Fairly understood, the negotiation and eventual agreement concerned the proportionate allocation of stock interests in PROPAC and PROPAC–Mass among the interested parties in these joint enterprises. No purchase or sale was contemplated.

However, even if considered a sale of securities falling within the ambit of the statute of frauds, subsection (c) of *N.J.S.A.* 12A:8–319 renders this contract enforceable. The jury found an agreement among the parties, satisfying that essential prerequisite to application of subsection (c). The memorandum of November 17, 1989, memorializes the parties' prior agreement and Chang's silence for well more than ten days renders the agreement enforceable. Her subsequent actions in connection with the

new related insurance entities demonstrate ratification of the essential terms of that agreement.

The jury's verdict is sustainable on the record before us and should not be disturbed. Therefore, we reverse the Appellate Division's judgment on the issue of the statute of frauds. We affirm the judgment on the admissibility of the McDonough certification. The matter is remanded to the Superior Court, Appellate Division for further proceedings consistent with this opinion.

*For reversal in part; affirmance in part and remandment—* Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LAVECCHIA—7.

*Opposed*—None.