This appeal concerns an intrafamily dispute between Joseph Dzwonkowski, Sr. ("Joe Sr.," or "the father"), and two of his sons, Robert Dzwonkowski and Joseph Dzwonkowski, Jr. ("Joe Jr.," or collectively "the sons"), as to the ownership and control of Sonitrol of Mobile, Inc., a closely held corporation doing business in Mobile County. The parties are shareholders and directors of Sonitrol.
The father has been president of the Sonitrol franchise in Mobile since 1977. *Page 600 
Before 1990, all shares of the corporation were held in a voting trust controlled by the father. In 1990, nine shares of stock were issued, as follows: one share to Joe Sr.; four shares to Robert; and four shares to Joe Jr. At the same time, the parties executed a buy-sell agreement that gave the corporation or the remaining shareholders the option to purchase the shares of a shareholder whose employment with the corporation had ceased. In 1994, Joe Jr. transferred his four shares of Sonitrol stock to Joe Sr., in exchange for his father's paying certain debts and paying for Joe Jr.'s treatment for gambling addiction. The record contains a certificate of shares, with an issue date of February 16, 1990, endorsed by Joe Jr. and delivered to Joe Sr. on July 13, 1994. Joe Sr. never reendorsed the certificate to Joe Jr.; the certificate remained in Joe Sr.'s possession until it was admitted in evidence in the instant case. Joe Jr. alleged that his father had promised to return the four shares of stock to him once he "got his life in order." Joe Jr. also alleged that his father's conduct since 1994 has evinced an intent to re-transfer the stock to him.
In November 1999, the father, acting as the president of Sonitrol, terminated the sons as employees of the corporation and demanded that the sons offer their shares of stock back to the corporation pursuant to the 1990 buy-sell agreement. The sons responded by calling a special meeting of the board of directors for the purpose of removing the father as president of the corporation.
On December 3, 1999, the father filed a declaratory-judgment action, seeking a determination of the ownership of stock in the corporation and a temporary restraining order ("TRO") to prevent the sons from holding a special meeting of Sonitrol's board of directors or from otherwise acting as directors and officers of Sonitrol. The sons counterclaimed, alleging that the father had interfered with the business operations of Sonitrol and had wrongfully diverted funds belonging to Sonitrol. They sought, among other things, a TRO to prohibit the father from acting in any representative capacity on behalf of Sonitrol.
Following a hearing, the circuit court determined, on December 13, 1999, that Sonitrol's board of directors consisted of Joe Sr., Robert, and Joe Jr. and that the directors' meeting called by the sons was authorized by Sonitrol's bylaws. Immediately following that determination, a meeting of the Sonitrol board of directors took place. The sons attended the meeting; the father did not attend. By a majority vote of the directors, the father was removed as an officer, discharged from employment, and asked to surrender his stock for resale to the corporation. The following officers were then elected at the meeting: Joe Jr., president; and Robert, vice-president, secretary, and treasurer.
The court set a hearing date of March 1, 2000, to determine the ownership of four shares of stock originally issued to Joe Jr., later transferred to Joe Sr., and then claimed by Joe Jr. On January 17, 2000, however, the court notified the parties that the trial on the disputed stock-ownership issue would be heard by an advisory jury on January 19. After a two-day trial, the jury rendered an advisory verdict finding that the father owned five shares, Robert owned four shares, and Joe Jr. owned no shares.
Four days later, on January 24, the sons moved to amend their pleadings to add a defense that, they claimed, was previously unknown to them and that, they contended, entitled them to a judgment as a matter of law on the issue of the stock ownership. The trial court granted the motion *Page 601 
to amend and, on January 26, 2000, held another hearing on the stock-ownership issue. At that hearing, the sons presented evidence, which they alleged was newly discovered, indicating that the father had previously testified, in a February 1999 deposition in connection with a Florida divorce proceeding involving the father's second wife, that the father owned only one share of Sonitrol stock and that Robert and Joe Jr. each owned four shares of stock. The sons argued that the father was barred by the doctrine of judicial estoppel from claiming, in an Alabama court proceeding, ownership of more than one share of Sonitrol stock when he had previously declared, in a Florida court proceeding, that he owned only one share. The trial court agreed with the sons' estoppel argument; on February 4, 2000, the court entered an interlocutory order determining that Joe Sr. was estopped from asserting ownership of more than one share of Sonitrol stock. The court found that the ownership of the nine outstanding shares of Sonitrol stock was as follows: Joe Sr. — one share; Robert — four shares; Joe Jr. — four shares.
On September 27, 2000, Joe Sr. moved the court to reconsider its order of February 4, 2000. He alleged that his deposition testimony in the Florida divorce was not newly discovered evidence; that the deposition had been in existence at the time of the hearing before the advisory jury; that, with due diligence, the sons could have produced his deposition at the earlier hearing; and that the sons had thereby waived the defense of judicial estoppel.
On December 22, 2000, the sons moved for a partial summary judgment on the issue of the stock ownership. On February 7, 2001, the trial court entered an order denying Joe Sr.'s motion to reconsider its interlocutory order of February 4, 2000, and certified that order as one suitable for a permissive appeal to the Alabama Supreme Court pursuant to Rule 5, Ala.R.App.P. On March 5, 2001, Joe Sr. filed a notice of appeal; the appeal was dismissed as untimely on May 9, 2001.[1]
On August 20, 2001, the trial court entered an order granting the sons' motion for a partial summary judgment and certified that order as final pursuant to Rule 54(b), Ala.R.Civ.P. From the August 20, 2001, partial summary judgment in favor of the sons, Joe Sr. appealed to the Alabama Supreme Court. The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
 I. The Sons' Motion to Dismiss the Father's Appeal
The sons argue that the father's appeal should be dismissed insofar as it raises issues that were made the basis of the interlocutory orders of February 4, 2000, and February 7, 2001. The sons maintain that the father's failure to file a timely petition pursuant to Rule 5, Ala.R.App.P., for a permissive appeal from the interlocutory orders constitutes a waiver of the father's right to assert that the basis for the interlocutory orders was erroneous. We disagree.
Citing Thompson Properties v. Birmingham Hide Tallow Co., [Ms. 1000215, November 2, 2001] ___ So.2d ___ (Ala. 2001),[2] and ConsecoFinance Corp. v. Sharman, 828 So.2d 890 (Ala. 2001), the sons contend that the father is entitled to only "one bite at the appellate apple."Thompson Properties and *Page 602 Conseco Finance, however, are inapplicable. Those decisions hold that a party who fails to seek or to obtain permission to appeal from the denial of a summary judgment or from the denial of a motion to dismiss (both of which are interlocutory orders) may not seek review of thoseinterlocutory orders upon a later appeal from a final judgment. Here, Joe Sr. is not seeking review of interlocutory orders; he is seeking review of a final judgment, namely: the partial summary judgment entered in favor of Robert and Joe Jr. and certified as final pursuant to Rule 54(b), Ala.R.Civ.P. This court must affirm that judgment if it can be upheld on any ground, see Ex parte Ramsay, 829 So.2d 146 (Ala. 2002); Exparte Ryals, 773 So.2d 1011 (Ala. 2000); Smith v. Equifax Servs., Inc.,537 So.2d 463 (Ala. 1988), including the ground stated in the interlocutory orders of February 4, 2000, and February 7, 2001 — that principles of judicial estoppel barred Joe Sr. from claiming ownership of more than one share of stock.
Having determined that the father's appeal is not due to be dismissed, we must now determine the propriety of the partial summary judgment. The principles of law applicable to a motion for a summary judgment are well settled. To grant the motion, the trial court must determine that the evidence does not disclose a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P. If the movant makes a prima facie showing that those two conditions are satisfied, then the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact.Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); § 12-21-12(d), Ala. Code 1975. Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462,465 (Ala. 1997). We must review the record in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant.Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).
By entering the partial summary judgment, the trial court necessarily decided that there was no genuine issue of material fact regarding the stock ownership and that the sons were entitled to a judgment as a matter of law on the stock-ownership issue, i.e., that Joe Sr. owns one share, that Robert owns four shares, and that Joe Jr. owns four shares of Sonitrol stock.
II. The "Transfer-of-Shares" Agreement
The sons contend that some time after July 13, 1994, when Joe Jr. endorsed and delivered his stock certificate to his father, Joe Sr. effectively transferred the four shares of stock back to Joe Jr. The sons argued below, and the trial court was apparently persuaded, that a document signed by the father and the sons on May 15, 1995, was "definitive as a matter of law" on the issue of stock ownership.
On May 15, 1995, the parties entered into the following "Transfer of Shares Agreement":
"TRANSFER OF SHARES AGREEMENT
 "The purpose of this agreement is to document the transfer and exchange of Capital Stock between Robert Dzwonkowski, a resident of Fergus Falls, Minnesota and Joseph Dzwonkowski, Jr., a resident of Pensacola, Florida. The effective date of this transfer is to be May 15, 1995. *Page 603 
 "Whereas Robert Dzwonkowski works primarily in the business of Barclay International of Minnesota, Inc., and Namekagon Forest Products, Inc., both associated with the kitchen cabinet business and the hardwood industry and both are located in the upper Midwest, where Robert Dzwonkowski resides. Joseph Dzwonkowski, Jr. works primarily in the business of Sonitrol of Mobile, Inc., a burglar alarm company located on the gulf coast of Alabama and Florida where he resides, and Robert and Joseph both feel that since their primary effort is in the businesses in which they work they both desire to consolidate their ownership in those businesses and exchange shares so that Robert owns Joseph's shares in Barclay and Namekagon and Joseph owns Robert's shares in Sonitrol.
 "It is further agreed and understood by both parties that the value they are receiving by exchanging their shares in each other's business is fair and equitable and after the exchange each person would be in a similar financial situation as before the exchange. This being especially true now that Barclay is going to be doing the additional finishing work for Western Cabinets.
 "Now it is agreed that the following is a list of stockholders in each company and percentage of ownership.
 "Barclay International of Minnesota, Inc. and Namekagon Forest Products Inc.:
 "Joseph Dzwonkowski, Sr. 6.7% "Joseph Dzwonkowski, Jr. 30.15% "Robert Dzwonkowski 30.15% "Rone's 33.00%
100.00%
"Sonitrol of Mobile, Inc.:
 "Joseph Dzwonkowski, Sr. 10% "Joseph Dzwonkowski, Jr. 45% "Robert Dzwonkowski 45%
 "It is further agreed that after the exchange of stock contemplated under this agreement the following will be the stockholders' ownership in each company:
 Barclay International of Minnesota, Inc. and Namekagon Forest Products, Inc.:
 "Joseph Dzwonkowski, Sr. 6.7% "Robert Dzwonkowski 60.3% "Rone's 33.0%
100.0%
"Sonitrol of Mobile:
 "Joseph Dzwonkowski, Sr. 10% "Joseph Dzwonkowski, Jr. 90%
100%
 "It is further understood that the Dzwonkowskis have to agree to a transfer of shares according to the restriction agreement on their shares. The signing of this transfer agreement will constitute the stockholders agreeing to the transfer.
 "The exchange of shares as indicated above is hereby agreed by the parties and the stockholders."
The transfer-of-shares agreement was signed by Joe Jr. and Robert as "Parties" and by Joe Jr., Robert, and Joe Sr. as "Stockholders." All signatures were witnessed and dated "5/15/95." The sons contend that the transfer-of-shares agreement is an unambiguous tripartite agreement establishing Joe Jr.'s ownership of the disputed four shares of stock as of May 15, 1995 — 10 months after Joe Jr. had transferred the shares to the father.
"The law [then] governing the transfer of title to shares of stock [was] found in Article 8 of the Uniform Commercial Code." Andrews v. TroyBank Trust Co., 529 So.2d 987, 990 (Ala. 1988).[3] Section 7-8-309, Ala. Code 1975, provided: *Page 604 
 "An indorsement of a security whether special or in blank does not constitute a transfer until delivery of the security on which it appears or if the indorsement is on a separate document until delivery of both the document and the security."
In Andrews, the Alabama Supreme Court stated that "[i]n the usual case, actual physical possession of the security by the [transferee] is necessary to complete a transfer of ownership in the security."529 So.2d at 991. The court explained:
 "Under § 7-8-309, a transfer of an investment security to a purchaser requires both an indorsement and a delivery of the security. . . . [I]t is readily apparent that an interest in a security does not pass until delivery of the security. `Delivery' is defined in the Code as `voluntary transfer of possession,' Section 7-1-201(14), and occurs when the purchaser (transferee) or someone on his behalf acquires actual possession of the security. Section 7-8-313(1)(a); Morris v. Kaiser, 292 Ala. 650, 299 So.2d 252
(1974)."
529 So.2d at 990.
The sons acknowledge that the father never reendorsed or physically delivered the certificate of shares to Joe Jr. Nevertheless, they contend that the transfer-of-shares agreement represents a conveyance of the shares from Joe Sr. to Joe Jr. by one of four means: contract; constructive delivery; equitable assignment; or gift.
 A. Contract
Joe Sr. argues that the transfer-of-shares agreement is not a three-party contract but a two-party contract, one that documents an exchange of mutual promises between Robert and Joe Jr., with Robert promising to transfer his shares of Sonitrol to Joe Jr., and Joe Jr. promising to transfer his shares in two Minnesota corporations to Robert. Joe Sr. points out that he signed the agreement in his capacity as a "stockholder," and not as a "party" to the promised exchange of stock between his sons; he says he signed as a stockholder only to waive the restrictions on the transfer of stock established in the 1990 Sonitrol buy-sell agreement.
We agree with Joe Sr. that the transfer-of-shares agreement is a contract only between Robert and Joe Jr. The agreement provides for an exchange of stock between the sons and states the consideration moving between Robert and Joe Jr. The agreement does not even purport to transfer stock between Joe Sr. and Joe Jr. Compare Kallop v. McAllister,678 A.2d 526, 531 (Del. 1996) (stating that "[a]n agreement 'purportingto . . . transfer shares of corporate stock' may be sufficient in itself to complete the delivery of a gift") (emphasis added) (quoting EquitableTrust Co. v. Gallagher, 31 Del. Ch. 88, 98, 67 A.2d 50, 54 (1949)). Joe Sr.'s interest in Sonitrol (10% or one share) is, according to the agreement, exactly the same before and after the transfer between the sons. The transfer-of-shares agreement cannot be considered a contract by Joe Sr. to transfer four shares of stock to Joe Jr. because it does not meet the basic requirements for a contract: it states no action or forbearance by Joe Sr. in return for an action or forbearance by Joe Jr.Compare § 7-8-319, Ala. Code 1975, the former "Statute of Frauds" for securities transactions, that, at the time relevant here, required, in a contract for the sale of securities, a writing "signed by the party against whom enforcement is *Page 605 
sought . . . sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price."[4] (Emphasis added.) See DeVito v. Sheeran, 165 N.J. 167,189, 755 A.2d 1147, 1160 (2000) (holding that a memorandum referring to the allocation of stock ownership did not satisfy § 8-319 of the Uniform Commercial Code).
Although Joe Sr.'s signature on the transfer-of-shares agreement may constitute evidence of his donative intent with respect to the four disputed shares of stock, and may be used to impeach or cast doubt upon his claim that he owns more than the 10%, or one share, reflected in the agreement, it does not constitute his contractual assent to transfer four shares of stock to Joe Jr. We conclude that, to the extent that the trial court decided that the transfer-of-shares agreement settled the question of the stock ownership as a matter of contract law, it erred.
 B. Constructive Delivery and Equitable Assignment
The sons are correct that Alabama law recognizes that a transfer of stock can be accomplished without physical delivery of the stock certificate, by constructive delivery, equitable assignment, or gift. SeeAndrews v. Troy Bank Trust Co., supra; Johnson v. Johnson,273 Ala. 688, 144 So.2d 12 (1962); Livingston v. Powell, 257 Ala. 38,57 So.2d 521 (1952); Thompson v. Hudgins, 116 Ala. 93, 22 So. 632
(1897).
In Johnson, a son who did not have possession of the stock certificates at issue notified a bank that he wanted to transfer to his mother his bank stock. The son later argued that there had been no valid transfer of the stock to his mother because there had been no delivery of the stock certificates to the mother. Rejecting that argument, the supreme court stated:
 "To hold in agreement with [the son's] contention that there must have been a delivery of the stock certificate along with his assignment to his mother would be to require an act at once impossible and useless. [The son] could not deliver what he did not hold, possess, or own. He did not possess the stock."
273 Ala. at 692, 144 So.2d at 16. The court quoted the following from a Massachusetts decision:
 "`Where the owner of stock, intending to make an absolute transfer, for lack of indorsement or because of some other defect in the mode of transfer, fails to transfer the legal title, it is held that by the transfer the equitable title goes over to the transferee . . . even though the provisions of that act [Uniform Stock Transfer Act] relative to transfers are not complied with, and though the act purports to state the only method of transfer.'"
273 Ala. at 694, 144 So.2d at 18 (opinion on rehearing) (quoting Whitneyv. Nolan, 296 Mass. 419, 424-25, 6 N.E.2d 386, 389 (1937)). Johnson does not compel a result *Page 606 
in favor of Robert and Joe Jr. because, in the present case, there is no mere "defect in the mode of transfer"; instead, there is a complete absence of indorsement or delivery of the stock certificate. Moreover, unlike Johnson, delivery of the stock certificate would not have been impossible in the present case.
In Andrews, a husband took his bank stock certificates to the bank and requested that the bank establish "joint ownership in the stock with his wife." 529 So.2d at 988. The husband died without having delivered the certificates to the wife, and the husband's executor argued that in the absence of delivery, there had been no transfer to the wife. The supreme court disagreed. Quoting an Idaho decision, the court stated:
 "`While the requirement of physical delivery contained in Article 8 [of the UCC] may serve a valid evidentiary purpose in the case of a sole owner, where, as here, there is more than one listed owner, the requirement that the new owners personally receive physical possession of the stock certificates to constitute a valid transfer is not applicable because both joint tenants cannot enjoy possession simultaneously.'"
529 So.2d at 991 (quoting Ogilvie v. Idaho Bank Trust Co.,99 Idaho 361, 365, 582 P.2d 215, 219 (1978)).
Concluding that Article 8 of the Uniform Commercial Code "did not abrogate the equitable principles . . . that, as between the parties, there may be a transfer of ownership of stock in a corporation where the owner presently intends to make such a transfer even though there is some technical defect in the mode of transfer," 529 So.2d at 992, the court held that "there was, at least, a constructive delivery of the stock to [the wife]," 529 So.2d at 992, and the wife had "acquired an interest in the stock by equitable assignment," 529 So.2d at 991.
In Andrews, the element of donative intent was undisputed and the element of delivery was only "technically" unsatisfied. Here, however, the issue of donative intent was highly disputed and delivery is completely lacking. In opposition to the sons' motion for a summary judgment, Joe Sr. presented evidence indicating that he had not transferred, and that he did not intend to transfer, the four disputed shares of stock to Joe Jr. He submitted an affidavit in which he stated that the transfer-of-shares agreement was prepared as a potential estate-planning tool in contemplation of certain future events that never occurred and, thus, the agreement never became operative. He presented evidence indicating that he has four children — Robert and Joe Jr. by his first wife, and two other children by his second wife. He stated that two years after the transfer-of-shares agreement was signed, he, Robert, and Joe Jr. met with a lawyer to set up an estate plan that would divide the ownership of Sonitrol among all four of his children. Joe Sr. submitted a letter from the estate-planning lawyer to Joe Jr., stating that, at the time of the meeting, the parties agreed that Joe Sr. owned five shares, Robert owned four shares, and Joe Jr. owned no shares of Sonitrol stock. In addition, Joe Sr. submitted the testimony of Joe Jr., taken in a deposition on September 18-19, 2000, in which Joe Jr. admitted that he had stated to the Internal Revenue Service ("I.R.S."), under penalty of perjury, that he owned no stock in Sonitrol in mid-1999. Finally, the trial court had before it undisputed evidence that all three parties — Joe Sr., Robert, and Joe Jr. — continued to treat Robert as the holder of four shares of Sonitrol stock even after the transfer-of shares agreement was signed, thus supporting Joe Sr.'s argument that Robert and Joe Jr. never exchanged *Page 607 
shares and the transfer-of-shares agreement never became operative.
 C. Gift
A gift of stock "is accomplished . . . [b]y actual or symbolic delivery of the subject of the gift, with intent to give." Thompson v. Hudgins,116 Ala. at 106, 22 So. at 636. See also Hudgens v. Tillman, 227 Ala. 672,151 So. 863 (1933). "A promise to make a gift, is not a gift. It is void — not enforceable." Thompson, 116 Ala. at 106, 22 So. at 636. One claiming to be a donee of a gift of stock must prove the elements of a gift by clear and convincing evidence. Davis v. Wachter, 224 Ala. 306,309, 140 So. 361, 363 (1932). Assuming that the sons made a prima facie showing as to the elements of a gift, we hold that Joe Sr. presented substantial evidence creating a genuine issue of material fact concerning whether he made a gift, promised to make a gift, or intended to make a gift of stock to Joe Jr.
 D. Conclusion as to the Transfer-of-Shares Agreement
We conclude that the transfer-of-shares agreement of May 15, 1995, is not dispositive as to the stock ownership in Sonitrol. Even if Joe Sr.'s signature on the transfer-of-shares agreement is some evidence indicating that he recognized Joe Jr.'s ownership of 45%, or four shares, of Sonitrol stock, that evidence was contradicted by Joe Sr.'s affidavit and other materials submitted in opposition to the motion for a summary judgment. The Alabama decisions concerning transfers of stock by constructive delivery, equitable assignment, and gift do not provide a basis for holding that the transfer-of-shares agreement entitled the sons to a summary judgment. For all three exceptions to the Article 8 transfer rule, there are material questions of fact concerning donative intent that are unsuited to resolution by a summary judgment.
 III. Judicial Estoppel
The trial court determined that Joe Sr. was estopped from claiming ownership of five shares of Sonitrol stock by his earlier testimony in a Florida divorce proceeding that he owned only one share of Sonitrol stock, and that his sons Robert and Joe Jr. each owned four shares. The doctrine of judicial estoppel, however, does not provide a basis for affirming the partial summary judgment in favor of the sons.
In Jinright v. Paulk, 758 So.2d 553 (Ala. 2000), the supreme court held that judicial estoppel does not always bar a plaintiff from later suing on a claim that he had not declared as a potential asset in a bankruptcy proceeding. In Jinright, the court discussed and clarified the doctrine of judicial estoppel. The court stated:
 "The doctrine of judicial estoppel `applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system[,] while equitable estoppel focuses on the relationship between the parties to the prior litigation.' Selma Foundry Supply Co. v. Peoples Bank Trust Co., 598 So.2d 844, 846 (Ala. 1992) (quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532
(1988)). The doctrine is applied to uphold the integrity of the judicial system. Chandler v. Samford University, 35 F. Supp.2d 861 (N.D.Ala. 1999). However, this Court has recognized a number of limitations upon the rule against asserting inconsistent positions in judicial proceedings.
 "`"[T]he following have been enumerated as essentials to the establishment *Page 608 
of an estoppel under the rule that a position taken in an earlier action estops the one taking such position from assuming an inconsistent position in a later action: (1) The inconsistent position first asserted must have been successfully maintained; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and questions must be the same; (5) the party claiming estoppel must have been misled and have changed his position; and (6) it must appear unjust to one party to permit the other to change."'
 "28 Am. Jur.2d § 70 Estoppel and Waiver (1966) (as quoted with approval in Porter v. Jolly, 564 So.2d 434, 437 (Ala. 1990)). Thus, a party may not claim the benefit of the doctrine of judicial estoppel unless the party can demonstrate that the party against whom the estoppel is sought procured a judgment in its favor as a result of the inconsistent position taken in the prior proceeding. Moreover, the party claiming the estoppel must have been misled by the conduct of the party against whom the estoppel is sought, and consequently changed its position to its prejudice. Id."
758 So.2d at 555.
Joe Jr. argues that the holding in Jinright is limited to the situation in which a petitioner in bankruptcy omits a potential claim in his schedule of assets and then later sues on that claim. We do not readJinright so narrowly, however, and we can find no indication that our supreme court, in outlining the elements that must be proved to establish judicial estoppel, confined its statements to the bankruptcy context.
We hold that the doctrine of judicial estoppel is inapplicable here for at least two reasons. First, Robert and Joe Jr., the parties asserting the estoppel, were not parties to the Florida divorce action. Cf. Singleyv. Bentley, 782 So.2d 799 (Ala.Civ.App. 2000) (holding that a farmer was not estopped to recover against a harvester for underpayment on 27,000 bushels of sweet potatoes by the farmer's claim, in filing for federal crop-disaster benefits, that his crop had produced only 15,000 bushels; the harvester was not a party to the farmer's application for benefits). Second, the parties claiming the estoppel did not establish that they were misled by Joe Sr.'s testimony in the Florida divorce proceedings and did not show that, as a consequence of Joe Sr.'s testimony, they changed their positions to their detriment. The material Joe Sr. submitted in opposition to the motion for a summary judgment tends to show that Joe Jr. was neither misled by nor changed his position in response to his father's deposition testimony because, five months after the deposition, Joe Jr. informed the I.R.S. that he held no stock in Sonitrol.
Robert argues that the summary judgment can be upheld on the grounds of another judicial estoppel that was not made the basis of the trial court's interlocutory orders of February 4, 2000 and February 7, 2001, namely that Joe Sr. was estopped from asserting his ownership of five shares of stock by his assertion in earlier proceedings before the Florida Electrical Contractors Licensing Board ("the Florida Board") that he owned only one share of the stock.
On October 22, 1996, Sonitrol applied to the Florida Board for an electrical contractor's license, and Joe Sr. was designated on the application as the "primary qualifier." The application contains a sworn statement by Joe Sr. that he is the president of Sonitrol and that he owns one-ninth of the corporate stock. The application forms include a financial responsibility *Page 609 
questionnaire inquiring whether the applicant has ever filed a voluntary or involuntary petition in bankruptcy. Joe Sr. answered that he had filed two bankruptcy petitions, both arising out of his personal guaranty of the debts of Barclay International, a Minnesota corporation of which he was the president.
The Florida Board regulations provide that it may refuse to qualify an applicant if any of its corporate officers or shareholders owning 10% or more of the corporate stock have, in the five years preceding the application, filed a petition in bankruptcy arising out of the construction operations of the applicant. On March 10, 1998, the Florida Board denied the license application on which Joe Sr. was shown as the primary qualifying agent for Sonitrol based on the Board's concerns regarding Joe Sr.'s overdraft history at SouthTrust Bank of Mobile and his prior bankruptcies. On May 14, 1998, however, the Board issued an "Order on Reconsideration" stating that it would reopen the matter to receive further information concerning Joe Sr.'s financial status.
Robert argues that in order to become the primary qualifier Joe Sr. "had to represent that he was merely a 10% holder of the corporate stock of Sonitrol because of his bankruptcy problems." He maintains that Joe Sr., having made such a representation, is estopped to claim that he holds more than 10% of the Sonitrol stock.
The Board's order on reconsideration states that Joe Sr. appeared before the Board to discuss his financial difficulties. The order concludes that both of his personal bankruptcies arose out of the same business transaction with Barclay International, a company not engaged in electrical contracting work. The order recites that the Board had requested information from SouthTrust Bank of Mobile regarding Joe Sr.'s "overdraft situation" and that "upon receipt and review of a satisfactory explanation from SouthTrust Bank . . . the Board will approve the application [of Joe Sr.] as primary qualifier."
We assume that judicial estoppel applies to quasi-judicial proceedings before administrative agencies like the Florida Board. See ConsolidatedStores, Inc. v. Gargis, 686 So.2d 268 (Ala.Civ.App. 1996), overruled on other grounds, Bleier v. Wellington Sears Co., 757 So.2d 1163 (Ala. 2000); Singley v. Bentley, supra. Nevertheless, we conclude that all the elements for applying judicial estoppel are not met by the circumstances of the Florida Board proceedings.
First, there is no indication that the inconsistent position asserted by Joe Sr. — that he held one-ninth of the Sonitrol stock — was "successfully maintained" before the Florida Board. In other words, the Board agreed to reconsider Sonitrol's application for a license with Joe Sr. as the primary qualifier because it was satisfied that Joe Sr.'s prior bankruptcies involved a business that was not engaged in electrical contracting work, not because it was satisfied that Joe Sr. owned only one-ninth of the stock of Sonitrol.
Second, the record contains no "judgment rendered" by the Board. The May 14 order on reconsideration simply holds the application in abeyance pending receipt of further information from SouthTrust Bank of Mobile. All of the elements necessary to apply the doctrine of judicial estoppel are not present; therefore, Joe Sr.'s representations to the Florida Board do not estop him from claiming, in the present case, that he owns more than a one-ninth interest in Sonitrol. We hold that the summary judgment for Robert and Joe Jr. cannot be upheld based on the doctrine of judicial estoppel. *Page 610 
The judgment of the circuit court is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
Yates, P.J., and Thompson and Pittman, JJ., concur.
[1] A petition for permission to appeal pursuant to Rule 5(a), Ala.R.App.P., must be filed within 14 days of the trial court's certification, see Rule 5(a)(2), Ala.R.App.P.
[2] The November 2, 2001, opinion was withdrawn and another opinion substituted in Thompson Properties v. Birmingham Hide Tallow Co.,839 So.2d 629 (Ala. 2002).
[3] Article 8 as it read at the times at issue in this case was repealed by Act No. 96-742, Ala. Acts 1996, and a new Article 8 was enacted. The Code sections that are quoted here are from Article 8 as it read before January 1, 1997, the effective date of Act No. 96-742. Some of these Code sections have been replaced by other Code sections and some were repealed in their entirety and no longer have a corresponding section in Article 8.
[4] Section 7-8-113, Ala. Code 1975, proposed by Act No. 96-742 and effective January 1, 1997, provides:
 "A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making."
But see § 8-9-2(8), Ala. Code 1975, also proposed by Act No. 96-742
and effective January 1, 1997 (making "every agreement for the sale or purchase of securities other than through the facilities of a national stock exchange or of the over-the-counter securities market" subject to the Alabama general Statute of Frauds).