[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 356 
In this action by Joseph Dzwonkowski, Sr. ("Joe Sr."), against Sonitrol of Mobile, Inc. ("Sonitrol"), Robert Dzwonkowski ("Robert"), and Joseph Dzwonkowski, Jr. ("Joe Jr."), Joe Sr. appeals from a "judgment" of involuntary dismissal and default of his claims, and of the defendants' counterclaims, respectively. We dismiss the appeal.
This case is yet another appeal in "an intrafamily dispute between [Joe Sr.] and two of his sons, [Joe Jr. and Robert], as to the ownership and control of [Sonitrol], a closely held corporation doing business in Mobile County." Dzwonkowski v.Sonitrol of Mobile, Inc., 854 So.2d 598, 599 (Ala.Civ.App. 2002) ("Dzwonkowski I"). The action is based on a 4-count complaint filed by Joe Sr. against Sonitrol, Robert, and Joe Jr., and a 35-count counter-complaint filed by those defendants. The complaint, as last amended, contained claims alleging "misappropriation of funds and corporate waste" and breach of fiduciary duty, and seeking specific performance and an accounting.
As last amended, the counter-complaint against Joe Sr. contained lengthy factual averments of malfeasance. It alleged, among other things, that Joe Sr. was wrongfully refusing to tender his stock to Sonitrol, pursuant to provisions of a "Buy-Sell Agreement" executed on February 16, 1990, by Sonitrol, Joe Sr., Robert, and Joe Jr. It alleged that Joe Sr. had engaged in unauthorized self-dealing with Sonitrol Corporation, a Delaware corporation headquartered in Alexandria, Virginia, in acquiring from Sonitrol Corporation a franchise to operate security businesses in Birmingham, using a trademark owned by Sonitrol Corporation. The counter-complaint further alleged that Joe Sr. caused a financial loss to Sonitrol when he conveyed by quitclaim deed certain property to Sonitrol to cover personal expenses he had incurred in connection with the property. It alleged that Joe Sr. "illegally and fraudulently" sought to satisfy alimony obligations to a former wife by representing her as an employee of Sonitrol and by paying the former wife alimony from Sonitrol accounts in the form of "wages." The counter-complaint also alleged that Joe Sr. fraudulently filed a "Voluntary Petition under Chapter 11 of the Bankruptcy Code," in order to thwart the enforcement of court orders in this litigation.
The counter-complaint contained the following counterclaims: (1) "Specific Performance for Sonitrol — Buy-Sell Agreement for Stock of Joseph Dzwonkowski, Sr.," (2) "Declaratory Judgment — Buy-Sell Agreement for Stock of Joseph Dzwonkowski, Sr.," (3) "Injunctive Relief — Buy-Sell Agreement for Stock of *Page 357 
Joseph Dzwonkowski, Sr. and Other Certificates," (4) "Breach of Contract — Direct Shareholder Loan," (5) "Breach of Constructive Contract — Alimony Payments," (6) "Breach of Implied Contract in Fact — Alimony Payments," (7) "Waste of Corporate Assets — Alimony Payments," (8) "Unjust Enrichment and Restitution — Alimony Payments," (9) "Breach of Fiduciary Duty — Alimony Payments," (10) "Conversion — Customer Checks," (11) Breach of Fiduciary Duty — Customer Checks," (12) "Waste of Corporate Assets — Customer Checks," (13) "Unjust Enrichment and Restitution — Customer Checks," (14) "Invasion of Privacy — Other Shareholders," (15) "Usurpation of Corporate Opportunity — Injunctive Relief," (16) "Breach of Fiduciary Duty — Post Office," (17) "Intentional Interference with Contractual Relations — Post Office," (18) "Breach of Fiduciary Duty — Fraudulent Bankruptcy," (19) "Intentional Interference with Contractual Relations — Fraudulent Bankruptcy," (20) "Breach of Fiduciary Duty — Line of Credit," (21) "Intentional Interference with Contractual Relations — Line of Credit," (22) "Breach of Fiduciary Duty — Involuntary Bankruptcy," (23) "Intentional Interference with Contractual Relations — Involuntary Bankruptcy," (24) "Misappropriation of Funds," (25) "Depreciation of Stock Value," (26) "Breach of Officer Standard of Conduct," (27) "Declaratory Judgment — Transfer Agreement," (28) "Equitable Estoppel — Transfer Agreement," (29) "Breach of Fiduciary Duty — Quitclaim Deed," (30) "Waste of Corporate Assets — Quitclaim Deed," (31) "Unjust Enrichment and Restitution — Quitclaim Deed," (32) "Breach of Fiduciary Duty — CCM Debenture," (33) "Waste of Corporate Assets — CCM Debenture," (34) "Unjust Enrichment and Restitution — CCM Debenture," and (35) "Fraud — CCM Debenture." Compensatory and punitive damages were sought under counterclaims (7), (9), (10), (11), (12), (14), (16), (17), (18), (19), (20), (21), (22), (23), (24), (25), (26), (29), (30), (31), (32), (33), (34), and (35). Compensatory damages were sought under counterclaims (4), (5), and (6). Restitution damages were sought under counterclaims (8) and (13).
Sonitrol, Robert, and Joe Jr. moved for a summary judgment on counterclaims 27 and 28. Those counterclaims sought a judgment declaring that Joe Sr., who claimed ownership of five of the nine shares of outstanding Sonitrol stock, owned only one share of stock, and that four of the shares to which Joe Sr. claimed ownership belonged to Joe Jr. The trial court granted the motion, and Joe Sr. appealed. His appeal was the subject of DzwonkowskiI, in which the Court of Civil Appeals decided that there were genuine issues of material fact regarding ownership of the four disputed shares, so that a summary judgment was inappropriate. That court reversed the summary judgment and remanded the case for further proceedings.
On June 9, 2003, the trial court empaneled an advisory jury to try the factual questions regarding stock ownership. However, on June 12, 2003, the trial court, ruling from the bench, entered a default judgment against Joe Sr. on the counterclaims and dismissed his claims against Sonitrol, Robert, and Joe Jr. The trial court set forth its reasoning in a "final order and judgment" entered on June 20, 2003. That order stated, in pertinent part:
 "This matter came before the court for trial on the issue of the ownership of four (4) shares of stock in [Sonitrol], the rights to which are claimed by [Joe Sr.] and [Joe Jr.]. . . .
". . . . *Page 358 
 "As the opening statements unfolded on June 9, 2003, this litigation quickly became a question of whether Joe Sr. had committed perjury in Florida on at least two (2) occasions or was committing perjury in this Alabama litigation on the stock ownership issue. Evidence adduced at trial by Joe Sr., himself, and by [Sonitrol, Robert, and Joe Jr.] confirmed that Joe Sr. had, indeed, testified under oath in his Florida divorce deposition taken on February 16, 1999, that he did not, in fact, own the four (4) shares of stock [he now claims], but that Joe Jr. did own that stock since 1982. Additionally, in sworn testimony before the State of Florida Electrical Contractors' Licensing Board (`Florida Board') on May 14, 1998, Joe Sr., in his own voice and words, testified that he did not own the stock in question, but that Joe Jr. did own that stock since 1982.
 "Joe Sr. testified that he did not tell the truth on those and several other occasions regarding the stock ownership, but that he was remorseful over the Florida divorce deposition testimony and instructed his Florida lawyer to straighten it out. Yet, on February 22, 1999, Joe Sr. submitted a loan application on behalf of Sonitrol to Merrill Lynch Lending and Cash Management Services [`Merrill Lynch'] in which he set forth in his own handwriting that Joe Jr. owned the four (4) shares of stock in question. Joe Sr. testified he called Merrill Lynch and told them verbally that he owned five (5) shares of Sonitrol and that Robert owned four (4) shares.
 "The court has made no findings of fact from this testimony at this time, but summarizes the testimony only as it relates to the abusive litigation of Joe Sr. leading to this Final Order and Judgment.
 "This Final Order and Judgment is prepared without the opportunity to review the official reporter's transcript, which will take several weeks to complete. However, the abuses of the judicial system by Joe Sr. during the course of the trial were so pervasive and continuing that even a casual observer of the trial would have been appalled.
 "During both direct and cross-examination, Joe Sr. frequently raised his voice to a near scream. Whenever his veracity, recollection or business judgment was questioned during cross-examination, he would raise his voice and use derogatory terms in denigrating Joe Jr. and Robert, as well as their lawyers. Rather than answer the questions propounded on cross-examination, Joe Sr. used the opportunity to engage in character assassination, often after warning and instruction from the court to simply answer the question propounded.
 "In spite of repeated warnings by the court to keep his voice down, this conduct of Joe Sr. continued. The court was advised by the official reporter that she was having trouble reporting due to the loudness of Joe Sr.'s voice and the threatening manner in which he leaned over her during cross-examination by Mr. Sullivan.
 "One example of Joe Sr.'s flagrant disregard of the orders of this court during the trial came during his testimony on direct examination that Joe Jr. had allegedly been involved in gambling in conjunction with some of the most prominent citizens in Mobile. Joe Sr.'s own lawyer instructed him not to mention those persons by name. This court specifically instructed Joe Sr.: `Don't mention any names, I am not going to have any citizens' names slandered here.' Within seconds, Joe Sr., defying this court, named two persons who had allegedly been involved in gambling with Joe Jr. *Page 359 
 "Another example occurred when Joe Sr. did not consider one of Mr. Sullivan's questions to be worthy of answering. Joe Sr. exclaimed in a loud voice: `Have you been smoking something?'
 "Joe Sr. also totally disregarded an order granting . . . a motion in limine prohibiting anyone from mentioning that Joe Sr. had made allegations to the District Attorney of Mobile County against Joe Jr. and Robert for conduct relating to their dealings with Sonitrol after the litigation was commenced and adverse orders had been entered by the court. In spite of this order, this court can only conclude that Joe Sr. deliberately violated that order by stating that the last time that he had seen a set of Sonitrol checks `was in the State's Attorney's office.' Joe Sr.'s answer prompted a Motion to Discharge the Advisory Jury from [opposing] counsel, which this court reluctantly denied, giving curative instructions to the advisory jury.
 "The court was informed by the official reporter that Joe Sr.'s conduct was `hindering her job performance,' and that she was having great difficulty working with Joe Sr. behaving in the manner in which he was.
 "Joe Sr.'s counsel advised the court and [opposing counsel] in chambers that, in an attempt to control his client, he had instructed him, while undergoing cross-examination, to stop talking when he (counsel) stood up. In spite of these sensible instructions, when counsel for Joe Sr. stood and tried to object, he was loudly told by Joe Sr.: `Sit down, I want to answer this.'
 "During a particularly loud and angry exchange with Joe Jr.'s counsel on June 12, 2003, concerning the subject of `when this matter was first in court,' the undersigned pointed out to the parties that, according to the case action summary, [a] hearing . . . was held on December 9, 1999. With this, Joe Sr. began to loudly argue with the court over what exactly was heard at that hearing. In an effort to control Joe Sr.'s loud verbal conduct, the court advised Joe Sr. that if he continued to act this way the court would dismiss his case. The court excused the jury and instructed Joe Sr. to `cool off.'
 "The undersigned then met with all counsel in chambers to discuss whether it would be possible to continue with the trial given Joe Sr.'s repeated abuses of the decorum of the courtroom and willful flouting of the orders of this court. Extensive cross-examination of Joe Sr. remained from Messrs. Sullivan and Christian, the latter of whom had not yet even begun. The court advised counsel that Joe Sr. would be instructed that one more outburst would result in a default and/or dismissal against him. The court advised Joe Sr.'s counsel to confer with Joe Sr. to make sure that he understood the ramifications of this order.
 "Before the return of the jury, the court advised Joe Sr. that his conduct would not be tolerated and further instructed Joe Sr. that should he raise his voice again that a default and/or dismissal would be entered against him. Joe Sr. acknowledged on the record that he understood and agreed to go forward under those conditions.
 "The trial resumed and continued for thirty (30) minutes until the lunch break. After lunch, the trial resumed and Joe Sr.'s cross-examination continued for another thirty (30) minutes, when Joe Sr. began screaming at Joe Jr.'s counsel, Mr. Sullivan. It was at this point that the court enforced its prior order and orally entered a default against Joe Sr. as to [the] counterclaims and dismissed *Page 360 
Joe Sr.'s claims against [Sonitrol, Robert, and Joe Jr.] with prejudice under Rule 41(b), [Ala. R. Civ. P.]
 "It is fundamental that the judge has a duty and an obligation to maintain order in the courtroom during a trial. The court considered both finding Joe Sr. in direct contempt and granting a Motion to Discharge the Advisory Jury, or even declaring a mistrial. It was the court's opinion that Joe Sr. would not desist in his disruptive behavior by being cited for contempt and even sentenced to jail. Likewise, it is the court's opinion that simply discharging the jury or even ordering a mistrial was not proper since the jury was advisory and could always be dissolved if it had been influenced by Joe Sr.'s disruptive behavior, with the trial continuing before the court.
". . . .
 "This court recognizes that dismissal under Rule 41(b)[, Ala. R. Civ. P.,] and/or entry of a default judgment against Joe Sr. under the inherent power of the court to compel obedience to its orders is the most severe sanction that this court could apply. However, Joe Sr.'s conduct during this trial on June 9-12, 2003, has been willful and contumacious; he has violated every reasonable order of this court regarding his demeanor and abusive litigation tactics after delivery of numerous warnings from the court to both Joe Sr. and his counsel that a default judgment and/or dismissal would occur. This court has tried cases involving alleged or actual mass murderers and child rapists. Those accused of such crimes have from time to time in their trials exhibited [insolent] and disruptive behavior, but the conduct of Joe Sr. in this trial far exceeded their conduct.
 "There is no question in the mind of this court that a judgment by default on the counterclaims of [Sonitrol, Robert, and Joe Jr.] and an involuntary dismissal under Rule 41(b) of Joe Sr.'s claims is fully justified given the observations of this court of the actions of Joe Sr. during the trial proceedings of June 9-12, 2003. It is the conduct of Joe Sr. only . . . which has brought about this Final Order and Judgment. Accordingly, it is, therefore
 "ORDERED, ADJUDGED and DECREED that all claims of Joe Sr. in this litigation are dismissed with prejudice under Rule 41(b) of the Alabama Rules of Civil Procedure and the inherent power of the court, and that default judgment is GRANTED in favor of [Sonitrol, Robert, and Joe Jr.] and against Joe Sr. on all their respective counterclaims. Accordingly the court declares and orders that the ownership of stock in Sonitrol as of December 3, 1999, was as follows: Joe Sr. — one (1) share, Joe Jr. — four (4) shares, Robert — four (4) shares.
 "With respect to the counterclaims for declaratory and/or non-monetary relief, the court declares that Joe Sr. usurped the corporate opportunity of Sonitrol to acquire the Birmingham franchise from Sonitrol Corporation while he was still a director of Sonitrol. As to this particular claim, the court orders and enjoins Joe Sr. from operating the Birmingham franchise and directs that Sonitrol has all rights to that franchise immediately upon Sonitrol applying the amount of the actual franchise fee paid by Joe Sr. to Sonitrol Corporation to the outstanding shareholder loan due to Sonitrol from Joe Sr. The court also declares that Sonitrol, Joe Jr., and Robert are entitled to exercise any and all of their respective rights under the [Buy-Sell *Page 361 
Agreement] to the extent that such rights have not already been exercised.
 "As to all counterclaims of [Sonitrol, Robert, and Joe Jr.] which seek monetary damages, the court enters a default judgment on the issue of liability
against Joe Sr., and in favor of [Sonitrol, Robert, and Joe Jr.], with [their] being granted leave of court to submit evidence of monetary damages at a later date to be set by the court. Proof of such money damages, however, is stayed pending further orders of this court.
 "To the extent all of [such] counterclaims are not adjudicated on the merits herewith, the court makes an express determination that there is no just reason for delay and expressly directs entry of judgment under [Ala. R. Civ. P.] 54(b) as to the dismissal with prejudice of all of Joe Sr.'s claims and the default judgment of liability as to monetary counterclaims and complete default judgment as to non-monetary claims."
(Emphasis added.)
On July 18, 2003, Joe Sr. moved to alter, amend, or vacate the judgment. On September 24, 2003, Sonitrol, Robert, and Joe Jr. moved to supplement the order and judgment to hold, as an alternative basis for the judgment, that, based on Joe Sr.'s previous inconsistent testimony before two Florida tribunals, Joe Sr. was judicially estopped from claiming ownership of more than one share of Sonitrol stock.[1] On October 14, 2003, the trial court entered an order denying Joe Sr.'s motion to alter, amend, or vacate the judgment, and supplementing the order and judgment to hold, additionally, that Joe Sr. was judicially estopped from claiming ownership of the four disputed shares. Joe Sr. filed a notice of appeal on November 14, 2003.
On appeal, the parties apparently[2] join issue on (1) whether the default judgment against Joe Sr. on the counterclaims and the dismissal of his claims comported with due process, and, if so, whether the trial court exceeded its discretion in entering the default and the dismissal, as well as (2) whether the trial court erred in holding that Joe Sr. was judicially estopped by his testimony before two Florida tribunals from claiming ownership of the four shares of Sonitrol stock to which Joe Jr. also claimed ownership. However, all parties have overlooked a fundamental flaw in these appellate proceedings —the absence of an appealable judgment.
To be sure, the trial court recited the formula for certification of a judgment pursuant to Rule 54(b), Ala. R. Civ. P. However, "[n]ot every order has the requisite element offinality that can trigger the operation of Rule 54(b)." GoldomeCredit Corp. v. Player, 869 So.2d 1146, 1147 (Ala.Civ.App. 2003) (emphasis added). A claim is not eligible for Rule 54(b) certification unless it has been completely resolved by the judgment. It that regard, it must be remembered that "[d]amages are [an element] of a claim to vindicate a legal right."Grantham v. Vanderzyl, 802 So.2d 1077, 1080 (Ala. 2001).
"Where the amount of damages is an issue, . . . the recognized rule of law in Alabama is that no appeal will lie from a judgment which does not adjudicate that issue by ascertainment of the amount of those damages." Moody v. State ex rel. Payne,351 So.2d 547, 551 (Ala. 1977). "That a judgment is not final when the *Page 362 
amount of damages has not been fixed by it is unquestionable." "Automatic" Sprinkler Corp. of America v. B.F. Goodrich Co.,351 So.2d 555, 557 (Ala. 1977) (recitation of the Rule 54(b) formula was ineffective to render appealable a judgment that resolved liability, but reserved the issue of damages for future resolution). "[T]he trial court cannot confer appellate jurisdiction upon this [C]ourt through directing entry of judgment under Rule 54(b) if the judgment is not otherwise `final.'" Robinson v. Computer Servicenters, Inc.,360 So.2d 299, 302 (Ala. 1978). Thus, it is well-established that a claim for which damages are sought is insufficiently adjudicated for Rule 54(b) purposes until the element of damages is resolved; a judgment resolving only liability in an action seeking damages cannot be certified as final pursuant to Rule 54(b). Tanner v.Alabama Power Co., 617 So.2d 656 (Ala. 1993).
That this case suffers from this defect is self-evident. The trial court purported to certify for appellate review the default judgment of 35 counterclaims, 29 of which sought damages that are yet to be determined. Because the trial court's order was ineffective to confer appellate jurisdiction over those counterclaims, the judgment, as it relates to the 29 counterclaims seeking damages, is nonfinal and nonreviewable at this time.
"`When it is determined that an order appealed from is not a final judgment, it is the duty of the Court to dismiss the appealex mero motu.'" Tatum v. Freeman, 858 So.2d 979, 980
(Ala.Civ.App. 2003) (quoting Powell v. Republic Nat'l Life Ins.Co., 293 Ala. 101, 102, 300 So.2d 359, 360 (1974)). Therefore, we are compelled to dismiss this appeal, insofar as it relates to the counterclaims for damages.
We also dismiss the appeal as to the remaining claims and counterclaims seeking nonmonetary relief. Although they do not suffer the same deficiency as the counterclaims for damages, they are, nevertheless, postured in such a manner as to evade current review. This is so, because the judgment of dismissal and default purports to bring up as a unit all the claims and counterclaims. Thus, the judgment, as it pertains to those claims, is not subject to resolution independently of the 29 counterclaims for damages.
In that connection, Joe Sr. states:
 "The trial court's final order and judgment, dismissing Joe Sr.'s claims with prejudice and entering a default judgment against him on his sons' counterclaims, violated the due process clause of the United States and State Constitutions, in depriving Joe Sr. of his property interest without a hearing. Such sanctions cannot be constitutionally imposed as mere punishment for a party's conduct at trial. Joe Sr. did not fail to produce evidence so as to raise a presumption as to the untruth of his answer to the [counter-complaint] and thus justify a default. Nor was there any default by Joe Sr. in the prosecution of his claims so as to justify dismissal of his claims.
 "Assuming arguendo that the court had the constitutional power to impose the sanctions of dismissal and/or default, the court abused its discretion in doing so. The conduct of Joe Sr. did not merit the draconian sanctions imposed. These sanctions were not only disproportionate to his conduct but were also overly broad. They adjudicated claims which were not even being tried at the time of the jury trial below.
". . . .
 ". . . Finally, these sanctions were, on their face, overly broad and draconian in their impact upon Joe Sr.'s property interest. The judgment extended not *Page 363 only to the issue of stock ownership, which was the only issue being tried at the time, but to each and every claim and counterclaim that had been filed in the litigation. Joe Sr. lost not only the right to dispute his stock ownership in Sonitrol but also suffered the involuntary transfer of his own alarm business in Birmingham and default liability on numerous counterclaims for money damages alleging intentional and unintentional tortious activity. All of this occurred without a single witness or document introduced in support of any of these counterclaims."
Joe Sr.'s brief, at 35-36, 68 (emphasis added).
As Joe Sr. concedes, none of the claims or counterclaims have been litigated on the merits. They all travel together in the single judgment of default and dismissal. Thus, resolution of the judgment as to the claims and the counterclaims for which damages are not sought would necessarily compel us to resolve the liability aspect of those counterclaims over which this Court clearly has no appellate jurisdiction.
It bears repeating, here, that "`[c]ertifications under Rule 54(b) should be entered only in exceptional cases and should not be entered routinely.'" State v. Lawhorn, 830 So.2d 720, 725
(Ala. 2002) (quoting Baker v. Bennett, 644 So.2d 901, 903 (Ala. 1994), citing in turn Branch v. SouthTrust Bank of Dothan,N.A., 514 So.2d 1373 (Ala. 1987)). "`"Appellate review in apiecemeal fashion is not favored."'" Goldome Credit Corp.,869 So.2d at 1148 (quoting Harper Sales Co. v. Brown, Stagner,Richardson, Inc., 742 So.2d 190, 192 (Ala.Civ.App. 1999), quoting in turn Brown v. Whitaker Contracting Corp.,681 So.2d 226, 229 (Ala.Civ.App. 1996)) (emphasis added).
The trial court exceeded its authority in certifying as final the counterclaims for compensatory damages, and exceeded itsdiscretion in certifying the remaining claims and counterclaims as final. A nonfinal judgment will not support an appeal.Whitehurst v. Peak, 819 So.2d 611, 615 (Ala. 2001). Consequently, this appeal is dismissed as being from a nonfinal judgment.[3]
APPEAL DISMISSED.
HOUSTON, LYONS, BROWN, and JOHNSTONE, JJ., concur.
[1] The motion was based on an intervening decision of this Court refining the elements of judicial estoppel. See Ex parteFirst Alabama Bank, 883 So.2d 1236 (Ala. 2003).
[2] The brief of Joe Sr. contains no statement of the issuespresented for review, as required by Rule 28(a)(6), Ala. R.App. P.
[3] If Joe Sr. deems it necessary to appeal again, we trust he will favor this Court with a statement of the issues, as required by Rule 28(a)(6), Ala. R.App. P.