**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0656-19

MEDICAL INDICATORS, INC.,

    Plaintiff-Respondent,

v.

MOSHE LAVID,

    Defendant-Appellant.

_____

> Argued March 8, 2021 – Decided October 4, 2021
>
> Before Judges Hoffman, Suter, and Smith.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Mercer County, Docket No. C-000032-16.
>
> Bruce I. Afran argued the cause for appellant.
>
> Mary Sue Henifin argued the cause for respondent (Buchanan Ingersoll & Rooney, PC, attorneys for respondent; Mary Sue Henifin, of counsel and on the brief).

    The opinion of the court was delivered by

SUTER, J.A.D.

Defendant Moshe Lavid appeals the trial court's September 5, 2019 order that limited his ownership interest in plaintiff Medical Indicators, Inc. (MII) to 100,000 shares of common stock. He argues the order was not supported by substantial, credible evidence and that it relied on the erroneous admission under New Jersey Rule of Evidence 804(b)(6) of business journal entries by a deceased declarant. Defendant argues the trial court erred as a matter of law by finding his claims were barred by the statute limitations for contracts and by the equitable doctrine of laches. We affirm the September 5, 2019 order largely for reasons expressed by Judge Paul Innes, P.J. Ch., in his comprehensive, written decision of August 14, 2019.

I.

A.

The case involves a dispute over the number of MII shares [1] that defendant owns. In June 2016, MII filed an order to show cause and verified complaint in the Chancery Division seeking injunctive and declaratory relief against defendant. Count One sought to enjoin defendant from claiming he was entitled to more than 100,000 shares in MII. Count Two alleged defendant's material breach of an agreement excused MII from issuing any

---

[1] On April 15, 2019, MII was acquired by Medical Indicators Holding, Inc.

A-0656-19

more shares to him. Count Three alleged defendant's claim was barred by the six-year statute of limitations for contracts, while Count Four claimed it was barred by the doctrine of laches. Counts Five and Six requested declaratory relief barring additional shares because defendant breached an agreement and failed to make required payments. Count Seven claimed defendant did not participate in required research. Count Eight claimed there was an accord and satisfaction.

On August 1, 2016, defendant filed an answer that included counterclaims. In Count One, he requested a declaratory judgment that he owned twelve-and-a-half percent of the shares of MII. Count Two requested a judgment dismissing MII's verified complaint.

The case was tried over multiple days. On August 14, 2019, the trial court issued a written decision granting "judgment in favor of [MII] on its complaint and against defendant on his counterclaim." The court found defendant owned 100,000 shares of MII. On September 5, 2019, it entered an order granting relief to MII on Counts One (injunction), Two (breach of agreement), Three (statute of limitations), Four (laches) and Six (failure to pay). The court found the remaining claims were moot in light of its decision on the other counts.

3

Defendant appealed the September 5, 2019 order. The value of these shares — which is $1,831,809.63 — remains on deposit with the Superior Court Clerk's office by consent of the parties.

B.

MII was incorporated in New Jersey in 1984 by Robert J. Witonsky ("Witonsky"). He was MII's president and chief executive officer. MII manufactured clinically accurate disposable thermometers. Witonsky passed away in 2002.

On June 7, 1988, MII and defendant entered into a written shares agreement (the Shares Agreement). Pursuant to the Shares Agreement, defendant agreed to invest $25,000 in MII payable as follows: $10,000 on or before June 13, 1988, and $15,000 on or before September 30, 1988. He agreed to assist MII in "[s]mall [b]usiness [i]novation (sic) [r]esearch [p]rograms" and to submit applications to the State for additional funding that MII might be able to obtain because of these small business contracts. In exchange, the Shares Agreement provided defendant was granted common stock in MII "equivalent to ownership of ten . . . percent of all shares," which were protected against "dilution" for a year. He also would receive common stock "at a rate of one . . . percent of the total authorized shares for every

twenty thousand . . . dollars of contracts awarded to MII on which [defendant] is a participant of record." If defendant did not pay $15,000 on or before September 30, 1988, the Shares Agreement provided "the terms [sic] of this agreement shall become null and void; however, [defendant] shall retain one hundred thousand (100,000) shares of MII common stock." Witonsky signed the Shares Agreement for MII; defendant signed it individually.

The parties do not dispute that defendant paid $10,000 and that he is a shareholder of MII holding 100,000 shares. What is disputed is whether defendant paid the second payment of $15,000 and thus, whether he owns twelve-and-a-half percent of the shares of MII.

Defendant owned M.L. Energia, Inc. (Energia). He alleges he paid Witonsky the additional $15,000 by entering into a sham "consulting agreement" with Witonsky through Energia. MII contends the consulting agreement was a valid agreement and that the $15,000 payment to Witonsky was for consulting services he performed and not for additional shares.

The Consulting Agreement, dated October 1, 1987, was signed by Witonsky as "consultant" and by defendant for Energia. Under the Consulting Agreement, Witonsky agreed to provide the services of a consultant in certain specialized areas, which were handwritten into the Consulting Agreement.

5

The term of the Consulting Agreement was October 1, 1987 to September 30, 1988.  Under it, Witonsky would be paid at a rate of $62.50 per hour.  He was to provide Energia with an invoice of the work he performed, and Energia would compensate Witonsky within sixty days after receipt of the invoice.  The Consulting Agreement "constitute[d] the entire understanding between the parties" and was not to be modified unless in writing "executed by both parties."

In a "Consulting Retainer," which was not dated, but was signed by Witonsky and by defendant for Energia, Energia retained Witonsky as an independent contractor for a total of fifty days from October 1, 1987, to September 30, 1988, for $500 per day.  Witonsky was to provide written reports when requested.  The parties' signatures reflected this was the parties' "total understanding of this Retainer."

In an invoice to Energia dated May 16, 1988, Witonsky requested compensation for his consulting services from "Oct. 1, 1987 through May 15, 1988" for a total of thirty consulting days at the rate of $500 per day, totaling $15,000.  Energia paid this invoice by a check dated July 1, 1988, to Witonsky, who deposited it in his personal bank account.

A-0656-19

Defendant argues the Consulting Agreement was a sham and that the $15,000 paid was really the second installment under the Shares Agreement. He testified the Consulting Agreement was intentionally structured "to match the same amount of money that was supposed to be under the share agreement":  $500 per day for fifty days or $25,000.  Defendant testified he regularly engaged in this form of accounting practice, was convicted in federal court for tax evasion and mail fraud for these practices and was sentenced to one-year probation and fined $1.4 million.

Defendant claimed he paid the first $10,000 under the Shares Agreement from personal funds of he and his wife.  He testified the May 16, 1988 invoice from Witonsky for $15,000 was for the second payment under the Shares Agreement and not for consulting services.  He testified this was an "accounting device" that would give a tax benefit to defendant because he could deduct the payment as an expense for his business instead of the payment later being taxable as a capital investment.  Defendant testified Witonsky did not provide consulting services, there were no records to say he did, and in fact, the Consulting Agreement was back dated because one of the

7

entries in Witonsky's business journal indicated it still was in draft form as of June 3, 1988.[2]

Defendant sent Witonsky a second check for $15,000 on November 1, 1988, although he requested Witonsky not to deposit it until November 4, 1988. Defendant testified he provided this check because Witonsky requested a check made out to MII to replace the one written in July 1988 written to him. Defendant argues on appeal that the November 1988 check constituted payment under the Shares Agreement and although somewhat late, it should have been treated as a payment because the Shares Agreement lacked a "time of the essence" clause. MII did not deposit the check.

Witonsky's business journal entry for November 16, 1988, noted that instead of cashing the November 1, 1988 check, he mailed defendant a "notice of default on [the] June Agreement" ("Notice of Default"), and enclosed defendant's undeposited, undated check for $15,000. Defendant acknowledged he retained an attorney in November 1988 although he claimed this had to do with small business innovation research programs.

---

[2] The June 3, 1988 business journal entry stated: "Sent copies (hand delivered) of Drafts of MII-Lavid, RJW-Energia and MII-Lavid Agreements to Moshe Lavid."

A-0656-19

Witonsky's January 12, 1989 business journal entry noted that defendant wanted 170,000 shares in MII but that he was not entitled to "anything more than 100,000 [shares]." Then in a letter dated February 22, 1989, to defendant, Witonsky contended the July 1988 check for $15,000 was for consulting services and that defendant owed him another $10,000 under the Consulting Agreement. The letter did not indicate the check was a payment under the Shares Agreement.

Roger Bailey, MII's secretary and treasurer, testified that MII's business records from 1988 showed defendant owned 100,000 shares of stock. On February 28, 2000, defendant emailed John Estill, the Vice-President of Operations and Administration of MII, requesting a stock certificate, reflecting his shares in MII. Mr. Estill sent defendant an application to replace his lost stock certificate, but defendant never returned it.

In 2016, Bailey contacted defendant and other shareholders about the potential sale of MII. In his conversation with defendant, Bailey told defendant he owned 100,000 shares of MII but defendant disagreed saying he owned more. Defendant responded by sending Bailey a copy of the Shares Agreement and a copy of the $10,000 check from June 13, 1988, and the $15,000 check dated July 1, 1988, from Energia to Witonsky.

A-0656-19

C.

The trial court determined defendant's stock ownership in MII was limited to 100,000 shares. It admitted fourteen business journal entries of Witonsky's from 1988 and 1989 into evidence under N.J.R.E. 804(b)(6) as an exception to hearsay from a deceased declarant. The court reviewed all the testimony of the witnesses and the documentary evidence, finding defendant was not a credible witness, and noting inconsistencies between his trial testimony and his deposition testimony. It found that "[MII] has proven by a preponderance of the evidence that defendant failed to make the payment of the $15,000 in satisfaction of the Shares Agreement." "According to the clear and unequivocal terms of the agreement, defendant's failure to make the payment rendered the agreement null and void." The court also found defendant's counterclaims were filed outside the six-year statute of limitations and that they were barred by the doctrine of laches.

On appeal, defendant raises the following arguments:

> I. THE TRIAL COURT ERRED AS A MATTER OF LAW AND/OR ABUSED ITS DISCRETION IN ADMITTING WITONSKY'S LOG ENTRIES INTO EVIDENCE UNDER RULE 804 AS STATEMENTS OF A DECEASED DECLARANT.

II.  THE TRIAL COURT'S FINDING THAT WITONSKY'S COMMUNICATIONS WERE SUFFICIENT TO TRIGGER THE STATUTE OF LIMITATIONS IS NOT SUPPORTED BY THE RECORD.

III.  EQUITABLE CONSIDERATIONS SHOULD BAR APPLICATION OF THE STATUTE OF LIMITATIONS WHERE MII HAD THE SAME OR SIMILAR KNOWLEDGE AS TO LAVID'S CLAIMS BUT EQUALLY FAILED TO COMMENCE ANY ACTION TO SETTLE THE ISSUE OF HIS SHARE OWNERSHIP.

IV.  LAVID HAD NO DUTY TO BRING AN ACTION TO VALIDATE HIS SHARE OWNERSHIP BECAUSE THE JUNE 7, 1988 AGREEMENT ITSELF CONVEYED OWNERSHIP OF AT LEAST [TEN PERCENT] OF THE COMPANY'S STOCK.

V.  AS TO THE MERITS, THE SUBSTANTIVE RECORD DOES NOT SUPPORT THE TRIAL JUDGE'S CONCLUSION THAT LAVID FAILED TO PAY FOR THE SECOND $15,000 INSTALLMENT TO COMPLETE HIS STOCK PURCHASE.

VI.  IN THE ALTERNATIVE, TIME WAS NOT OF THE ESSENCE IN THE JUNE 1988 AGREEMENT AND LAVID's SECOND TENDER OF $15,000 FOR THE STOCK PURCHASE ON NOVEMBER 1, 1988 SECURED HIS [TWELVE-AND-A-HALF PERCENT] INTEREST.

11

VII.  THE TRIAL COURT ERRED AS A MATTER
OF LAW IN FINDING LACHES BASED ON
WITONSKY'S DEATH.

II.

A.

"[O]rdinarily, an evidentiary determination made during trial is entitled to deference and is to be reversed only on a finding of an abuse of discretion . . . ." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374 (2010).  Rulings on evidence "must stand unless it can be shown that the trial court palpably abused its discretion." State v. Carter, 91 N.J. 86, 106 (1982).  Under the abuse of discretion standard of review, reversal is only appropriate in cases where the trial court's finding was "so wide of the mark that a manifest denial of justice resulted." Ibid.

Defendant contends the trial court erred by admitting Witonsky's business journals into evidence under N.J.R.E. 804(b)(6).  Although hearsay generally is inadmissible, an exception in civil proceedings is the admission of a statement by a deceased declarant where the statement is "made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy." N.J.R.E. 804(b)(6).

12

There are four conditions for admissibility under N.J.R.E. 804(b)(6),[3] which requires that: (1) the declarant is deceased; (2) the statement is made in good faith; (3) the statement is made on the declarant's own personal knowledge; and (4) there is probability from the circumstances that the statement is trustworthy. Est. of Hanges, 202 N.J. at 385. The trial court is to make a "particularized" finding pertaining to good faith, personal knowledge, and the trustworthiness of the statement. DeVito v. Sheeran, 165 N.J. 167, 194 (2000).

No one disputed that Witonsky passed away or the business journal entries were made by him based on his personal knowledge. The court found the entries were made in good faith.

> The good faith is that Dr. Witonsky, from all the testimony that's been presented, was religious about keeping a journal. He was putting in the journal information . . . to be able to use at a future time. He wanted to try to prepare a record that as far as he was concerned was accurate so that if he needed to rely upon his journal, he would be able to do so.

---

[3] We have no occasion to determine the admissibility of the business journal entries under the business records exception. N.J.R.E. 803(c)(6). The trial court found the business records exception did not apply because Witonsky had "absolutely no duty . . . to keep these books the way he kept them." MII did not file a cross-appeal of the September 5, 2019 order.

A-0656-19

The court also found the entries met the required element of trustworthiness. The court found Witonsky was a credible declarant, and that the entries in the business diaries were made "at or about" the time of the events described based on Witonsky's own firsthand knowledge. Multiple witnesses testified about "Witonsky's character for trustworthiness."

We find no abuse of discretion in the trial court's ruling. The court made a specific finding of good faith. See Est. of Hanges, 202 N.J. at 386 (requiring a finding of good faith not just the absence of bad faith). There was ample evidence from the witnesses that Witonsky was meticulous in keeping these business journals, recording the information contemporaneously with events. This was for his use, and he relied on it in his business. There was no evidence the business journals were inaccurate, created after the fact or made in contemplation of litigation. In fact, the circumstances testified to by the witnesses about Witonsky's notetaking were such that the statements in the business journals probably were trustworthy as they were corroborated by the dates and events recorded in other documents.

It was defendant's testimony that the trial court found lacked credibility. As the trial court observed, defendant testified Witonsky did not provide consulting services, but the record disputed this, showing a payment in July

14

1988 for consulting. Defendant testified the July 1, 1988 check was from his personal account, but the check stock said it was from Energia. At trial, defendant testified he could not recall certain information, but in his deposition, he had recalled it. Defendant testified at trial about a conversation with Witonsky about shares, but he did not relate this in his earlier certification or deposition. Defendant's testimony was not consistent with the dates on the checks and documents, or with the February 1989 letter from Witonsky to defendant.

The trial court did not find credible defendant's claim that although he retained an attorney in November 1988, he did not want the attorney to discuss the issue about shares. The court noted defendant pleaded guilty to crimes involving "dishonesty and false statements, including false statements to a government agency. . . . These crimes involved the manner in which he conducted his business affairs for a substantial period of time, from 1985-2000." The trial court found the conviction was "clear evidence of defendant's lack of credibility." There was no testimony from any of the other witnesses that Witonsky was part of this sort of scheme.

Because defendant's testimony was not credible, there were no facts to dispute — what the Shares Agreement, the Consulting Agreement and other

15

documents showed — which then supported the trustworthiness of the business journals.

B.

Defendant argues the trial court lacked substantial credible evidence to support its finding that defendant failed to pay the second installment of $15,000. Defendant contends he paid this on November 1, 1988, at the latest. Because the Shares Agreement did not include a time of the essence clause, defendant argues this payment secured his additional two-and-a-half percent interest in MII.

We afford a deferential standard of review to the factual findings of the trial court on appeal from a bench trial. Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 483-84 (1974). A trial judge's findings are binding on appeal when supported by adequate, substantial, and credible evidence. Id. at 484. These findings will not be disturbed unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). However, our review of a trial court's legal determination is plenary,

16

D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Our review of the record shows the trial court's findings were supported by substantial, credible evidence. Defendant's version of events rested on his testimony. It was not corroborated by the documentary evidence. The July 1988 check was made by Energia to Witonsky personally and not to MII, and then was deposited in Witonsky's personal account. The timing suggested this was for consulting services not for shares. Witonsky's business journal entries reflected the second payment for shares was never made.

Defendant then inconsistently argued that he paid another $15,000 for the shares in November 1988. There was no reason to do so if — as he argued — he had paid for this in July. When that check was issued, Witonsky sent it back along with a default notice. Defendant retained an attorney shortly after the November 1988 check was returned, and documents after that date noted the parties' disagreement about defendant's shares. Thus, the trial court had ample evidence to reject defendant's argument that he paid $15,000 in July 1988 for additional shares.

A-0656-19

Defendant relies on a business journal entry from June 3, 1988,[4] and testimony about it to argue the Consulting Agreement was backdated. However, both the language of the entry and testimony showed the entry was unclear at best. In questioning Bailey about the business journal entry, defendant's counsel asked:

> Question: And this refers to an agreement between RJW and Energia, in draft form, hand delivered to Energia, to Moshe Lavid, on Friday, June 3rd, 1988, doesn't it?
>
> Answer: I can't be sure that that's correct.

Bailey also testified there were three other documents "that were signed on June 7th" and that he "could make an equally good case that those three drafts were the ones that were sent."

Defendant argues the Shares Agreement was satisfied by his payment in November 1988 because that agreement did not include a time of the essence clause. This argument overlooks the plain language of the Shares Agreement that it would be "null and void" if the second payment were not made. It also is inconsistent with the null and void provision. There is no evidence the parties intended something different than what the document said. Witonsky's actions were consistent with the null and void provision by sending back the

---

[4] See footnote two.

A-0656-19

check and by issuing a notice of default. These facts support the trial judge's findings on the merits and its dismissal of the counterclaims.

C.

We also find no error in the trial court's order that defendant's counterclaims were barred by the six-year statute of limitations for contracts. "In New Jersey, causes of action based on contractual claims must be brought within six years 'after the cause of any such action shall have accrued.'" Crest-Foam Corp. v. Aetna Ins. Co., 320 N.J. Super. 509, 517 (App. Div. 1999) (quoting N.J.S.A. 2A:14-1). The statutory period begins to run when the cause of action accrues, which, for contract claims, occurs at the time of the alleged breach. 31 Williston on Contracts § 79:14 at 303-04 (Lord ed., 4th ed. 2004).

The Shares Agreement was executed on or about June 7, 1988. Defendant retained an attorney in November 1988 to meet with Witonsky to discuss issues he was having with MII. By January 12, 1989, Witonsky included a business journal entry that defendant wanted 170,000 shares and that he saw no basis for that. We agree with the trial court that by that time "defendant knew that [MII] had rejected his claim for more than 100,000 shares." Defendant was in default of the Shares Agreement in mid-November

19

1988. Defendant's counterclaims were not filed until August 1, 2016. This was well beyond the six-year statute of limitations.[5]

After carefully reviewing the record and applicable legal principles, we conclude defendant's further arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[5] We also agree the trial court did not err in finding defendant's claims would be barred by laches because of the length of the delay, the inadequacy of the explanation and the prejudice to MII in light of Witonsky's death in 2002. See Knorr v. Smeal, 178 N.J. 169, 181 (2003) (providing that "[t]he key factors to be considered in deciding whether to apply the doctrine are the length of the delay, the reasons for the delay and the 'changing conditions of either or both parties during the delay.'") (quoting Lavin v. Bd. of Educ., 90 N.J. 145, 152 (1982)).

A-0656-19